# In the
# United States Court of Appeals
## for the Eighth Circuit

DEVIN G. NUNES; NUSTAR FARMS, LLC; ANTHONY NUNES, JR.;
ANTHONY NUNES, III,

*Plaintiffs-Appellants,*

v.

RYAN LIZZA; HEARST MAGAZINES, INC.;
HEARST MAGAZINE MEDIA, INC.,

*Defendants-Appellees.*

Appeals from the United States District Court
for the Northern District of Iowa – Western,
Nos. 5:19-cv-04064-CJW and 5:20-cv-04003-CJW.
The Honorable Charles J. Williams, Judge Presiding.

## BRIEF OF DEFENDANTS-APPELLEES

JONATHAN R. DONNELLAN
RAVI V. SITWALA
NATHANIEL S. BOYER
SARAH S. PARK
NINA N. SHAH
KRISTEN L. HAUSER
THE HEARST CORPORATION
300 West 57th Street
New York, New York 10019
(212) 841-7000

*Counsel for Defendants-Appellees
Ryan Lizza, Hearst Magazine Media,
Inc. and Hearst Magazines, Inc.*



Appellate Case: 23-2322     Page: 1     Date Filed: 01/19/2024 Entry ID: 5355052

## APPELLEES' SUMMARY OF THE CASE

NuStar Farms, LLC ("NuStar"), Anthony Nunes, Jr. ("Anthony Jr."), Anthony Nunes, III ("Anthony III," together with Anthony Jr. and NuStar, the "NuStar Appellants"), and now-former-Congressman Devin Nunes (the "Congressman," with the NuStar Appellants, "Appellants"), sued Ryan Lizza, Hearst Magazines, Inc. ("HMI"), and Hearst Magazine Media, Inc. ("Hearst," with Lizza, "Appellees") for defamation. In its 101-page memorandum opinion and order, the district court (Williams, J.) granted summary judgment to Appellees ("Order," Ex. B of the Addendum to Appellants' Brief ("Br.")).

As the Order held, the implied "assertion" in the challenged *Esquire* article (the "Article") "that NuStar knowingly used undocumented labor is substantially, objectively true." The NuStar Appellants could not carry their burden of proving that Lizza's reporting was "negligent," either. The Congressman's claim, limited to Lizza's sharing of a hyperlink, failed under applicable California law for several reasons, including because he lacked evidence that Appellees intended to convey the defamatory implication.

The Order, supported by settled law, should be affirmed on any of several grounds. Appellants' Brief ignores the lower court's reasoning. This appeal can be submitted on the papers, though Appellees would be pleased to present at oral argument and request the same amount of time as Appellants.

Appellate Case: 23-2322     Page: 2     Date Filed: 01/19/2024 Entry ID: 5355052

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 8th Cir. R. 26.1A, Hearst advises the Court that it is the entity with a direct interest in the matters raised in the lawsuit.

Hearst is a direct wholly owned subsidiary of Hearst Communications, Inc., which is in turn an indirect wholly owned subsidiary of The Hearst Corporation, a privately held company.

HMI is a direct wholly owned subsidiary of Hearst.

No publicly held corporation owns 10% or more of the stock of Hearst, HMI, Hearst Communications, Inc., or The Hearst Corporation.

Appellate Case: 23-2322   Page: 3   Date Filed: 01/19/2024 Entry ID: 5355052

# TABLE OF CONTENTS

APPELLEES' SUMMARY OF THE CASE ....................................................i

CORPORATE DISCLOSURE STATEMENT.............................................ii

TABLE OF AUTHORITIES ......................................................................v

COUNTERSTATEMENT OF ISSUES ....................................................1

COUNTERSTATEMENT OF THE CASE...................................................4

    A.   The Article. ....................................................................4

    B.   The Congressman's Case.................................................8

    C.   The NuStar Appellants' Case..........................................8

    D.   The Summary Judgment Ruling. ....................................9

SUMMARY OF ARGUMENT ..............................................................13

ARGUMENT ...................................................................................15

I.   THE DISTRICT COURT CORRECTLY GRANTED SUMMARY
     JUDGMENT ON THE NUSTAR APPELLANTS' CLAIMS ...........17

    A.   The NuStar Appellants Failed to Create a Genuine Issue of Fact that
        the Article Was Materially False....................................17

       1.  The NuStar Appellants Knowingly Used Undocumented Labor. .. 17

       2.  Any Implication the NuStar Appellants "Conspired" to Hide the
          Hiring of Undocumented Workers Is Substantially True..............23

    B.   The NuStar Appellants Failed to Show Appellees Negligently
        Breached the Applicable Standard of Care.....................25

    C.   The NuStar Appellants Failed to Put Forth Admissible Evidence of
        Reputational Harm. ....................................................30

II.  THE COURT SHOULD AFFIRM SUMMARY JUDGMENT AS TO
      CONGRESSMAN NUNES'S CLAIM ............................................32

A. Under Applicable California Law, the Congressman's Claim Fails. ...................................................................... 32

   1. California Law Applies. ............................................ 33

   2. The Link Was Not a Republication of the Article. ......................... 38

   3. No Evidence of Special Damages. ................................. 41

   4. Hearst Did Not Publish the Link. ................................. 43

B. The Congressman Failed to Put Forth Clear and Convincing Evidence Appellees Intended to Convey the Implication. ............... 44

   1. Actual Malice. ...................................................... 44

   2. Actual Malice as to the Meaning of the Implication. .................... 45

   3. The Congressman Waived the Argument. .................................... 47

   4. The Congressman Failed to Show that Appellees Intended to Convey the Implication. ................................ 47

C. There Is No Clear and Convincing Evidence of Actual Malice as to the Truth of the Implication. ........................................ 48

D. The Congressman's Claim for Defamation by Implication, Based on the Reporting of True Facts, Is Unconstitutional. .......................... 52

III. THIS COURT LACKS JURISDICTION TO REVIEW THE MAGISTRATE JUDGE'S DISCOVERY RULING ........................ 56

CONCLUSION ................................................................................... 57

CERTIFICATE OF COMPLIANCE ............................................... 58

CIRCUIT RULE 28A(h) CERTIFICATION .................................. 59

CERTIFICATE OF SERVICE ........................................................ 60

Appellate Case: 23-2322   Page: 5   Date Filed: 01/19/2024 Entry ID: 5355052

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adam & Eve Jonesboro, LLC v. Perrin*,
  933 F.3d 951 (8th Cir. 2019) ................................................................... 15

*Allstate Ins. Co. v. Shah*,
  No. 15-CV-01786, 2017 WL 1228406 (D. Nev. Mar. 31, 2017)................ 40

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................ 2, 3, 15, 48

*Anschutz Ent. Grp., Inc. v. Snepp*,
  171 Cal. App. 4th 598 (2009) ................................................................. 41

*Behr v. Meredith Corp.*,
  414 N.W.2d 339 (Iowa 1987) ................................................................. 24

*Belcher v. Little*,
  315 N.W.2d 734 (Iowa 1982) ................................................................. 44

*Bertrand v. Mullin*,
  846 N.W.2d 884 (Iowa 2014) ................................................................. 50

*Bierman v. Weier*,
  826 N.W.2d 436 (Iowa 2013) ............................................................30, 31

*Biro v. Conde Nast*,
  171 A.D.3d 463 (N.Y. App. Div. 2019) .................................................. 40

*Biro v. Conde Nast*,
  963 F. Supp. 2d 255 (S.D.N.Y. 2013) .................................................... 50

*Blankenship v. Napolitano*,
  451 F. Supp. 3d 596 (S.D.W. Va. 2020) ................................................. 24

*Blankenship v. NBCUniversal, LLC*,
  60 F.4th 744 (4th Cir. 2023) .................................................................. 24

Appellate Case: 23-2322    Page: 6    Date Filed: 01/19/2024 Entry ID: 5355052

*Bose Corp. v. Consumers Union of U.S., Inc.*,
466 U.S. 485 (1984) ........................................................ 44, 45

*Brink's Inc. v. City of N.Y.*,
717 F.2d 700 (2d Cir. 1983) ............................................. 20

*Brown v. First Nat'l Bank of Mason City*,
193 N.W.2d 547 (Iowa 1972) .......................................... 30, 44

*Brown v. Hearst Corp.*,
54 F.3d 21 (1st Cir. 1995) ................................................ 1, 27

*Christoff v. Nestle USA, Inc.*,
47 Cal. 4th 468 (2009) ..................................................... 41

*Cianci v. New Times Publ'g Co.*,
639 F.2d 54 (2d Cir. 1980) .............................................. 35

*Clark v. Viacom Int'l Inc.*,
617 F. App'x 495 (6th Cir. 2015) .................................... 39, 40

*Compuware Corp. v. Moody's Invs. Servs., Inc.*,
499 F.3d 520 (6th Cir. 2007) .......................................... 45

*Condit v. Dunne*,
317 F. Supp. 2d 344 (S.D.N.Y. 2004) ............................. 36

*Daley v. Marriott Int'l, Inc.*,
415 F.3d 889 (8th Cir. 2005) ........................................... 56

*Davis v. Costa-Gavras*,
580 F. Supp. 1082 (S.D.N.Y. 1984) ................................ 38

*De Havilland v. FX Networks, LLC*,
21 Cal. App. 5th 845 (2018) ............................................ 2, 46

*Deeds v. City of Marion*,
914 N.W.2d 330 (Iowa 2018) .......................................... 24

*Doctor's Data, Inc. v. Barrett*,
170 F. Supp. 3d 1087 (N.D. Ill. 2016) ............................. 40

Appellate Case: 23-2322    Page: 7    Date Filed: 01/19/2024 Entry ID: 5355052

*Edwards v. Nat'l Audubon Soc'y, Inc.*,
556 F.2d 113 (2d Cir. 1977)................................................................3, 49

*Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*,
194 F. Supp. 3d 263 (S.D.N.Y. 2016) ...................................................... 41

*Fuchs v. Scripps Howard Broad. Co.*,
868 N.E.2d 1024 (Ohio Ct. App. 2006).................................................... 27

*Fuqua Homes, Inc. v. Beattie*,
388 F.3d 618 (8th Cir. 2004) .......................................................... 2, 35, 37

*Garrison v. State of La.*,
379 U.S. 64 (1964)..................................................................................52, 55

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974) ..................................................................................1, 26

*Gomes v. Fried*,
136 Cal. App. 3d 924 (1982).....................................................................2, 42

*Good Gov't Grp. of Seal Beach, Inc. v. Super. Ct.*,
22 Cal. 3d 672 (1978)................................................................................. 46

*Hanley v. Trib. Publ'g Co.*,
527 F.2d 68 (9th Cir. 1975) ................................................................35, 37

*Harris v. City of Seattle*,
152 F. App'x 565 (9th Cir. 2005) .......................................................... 50

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
491 U.S. 657 (1989) ................................................................................. 49

*Howard v. Antilla*,
294 F.3d 244 (1st Cir. 2002) .................................................................. 45

*In re Min. Res. Int'l, Inc.*,
565 B.R. 684 (Bankr. D. Utah 2017).................................................... 40

*In re Phila. Newspapers, LLC*,
690 F.3d 161 (3d Cir. 2012)..............................................................39, 40

Appellate Case: 23-2322    Page: 8    Date Filed: 01/19/2024 Entry ID: 5355052

*Janklow v. Newsweek, Inc.*,
  759 F.2d 644 (8th Cir. 1985) ............................................................*passim*

*Johnson v. Nickerson*,
  542 N.W.2d 506 (Iowa 1996) .........................................................26, 30

*Kamelgard v. Macura*,
  585 F.3d 334 (7th Cir. 2009) .........................................................35, 37

*Karp v. Miami Herald Publ'g Co.*,
  359 So. 2d 580 (Fla. Dist. Ct. App. 1978) .............................................. 27

*Kasky v. Nike, Inc.*,
  27 Cal. 4th 939 (2002).................................................................. 46

*Kendall v. Daily News Publ'g Co.*,
  716 F.3d 82 (3d Cir. 2013) ............................................................. 45

*Kendrick v. Fox Television*,
  659 A.2d 814 (D.C. 1995) .............................................................. 27

*Kinsey v. N.Y. Times Co.*,
  991 F.3d 171 (2d Cir. 2021).............................................................. 37

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
  313 U.S. 487 (1941) .................................................................... 33

*Klayman v. City Pages*,
  No. 13-CV-143, 2015 WL 1546173 (M.D. Fla. Apr. 3, 2015).................. 40

*U.S. ex rel. Klein v. Omeros Corp.*,
  897 F. Supp. 2d 1058 (W.D. Wash. 2012).............................................. 40

*L. Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc.*,
  844 F.2d 955 (2d Cir. 1988)............................................................. 35

*Larue v. Brown*,
  333 P.3d 767 (Ariz. Ct. App. 2014) ..................................................... 41

*Lauderback v. Am. Broad. Cos.*,
  741 F.2d 193 (8th Cir. 1984) ........................................................... 15

Appellate Case: 23-2322     Page: 9     Date Filed: 01/19/2024 Entry ID: 5355052

*Lee v. Armontrout,*
   991 F.2d 487 (8th Cir. 1993) .................................................. 56

*Levine v. CMP Publ'ns, Inc.,*
   738 F.2d 660 (5th Cir. 1984) .................................................. 35

*Lohrenz v. Donnelly,*
   350 F.3d 1272 (D.C. Cir. 2003) ............................................. 50

*Lokhova v. Halper,*
   995 F.3d 134 (4th Cir. 2021) ............................................39, 40

*Lyons v. Johnson,*
   415 F.2d 540 (9th Cir. 1969) .................................................. 20

*McKee v. Cosby,*
   874 F.3d 54 (1st Cir. 2017) .................................................... 35

*Mercer v. City of Cedar Rapids,*
   308 F.3d 840 (8th Cir. 2002) .................................................. 45

*Miami Herald Publ'g Co. v. Tornillo,*
   418 U.S. 241 (1974) ..............................................3, 52, 53, 55

*Middleton v. Sutton,*
   73 F.3d 355 (1st Cir. 1996) .................................................... 27

*Milkovich v. Lorain Journal Co.,*
   497 U.S. 1 (1990) ................................................... 18, 52, 55

*Montgomery v. Risen,*
   875 F.3d 709 (D.C. Cir. 2017) ............................................. 22

*Morse v. Times-Republican Printing Co.,*
   100 N.W. 867 (Iowa 1904) ................................................... 40

*N.Y. Times v. Sullivan,*
   376 U.S. 254 (1964) .............................................................. 44

*Newton v. Nat'l Broad. Co.,*
   930 F.2d 662 (9th Cir. 1990) ...............................................2, 46

ix

*Nix v. Major League Baseball*,
    62 F.4th 920 (5th Cir. 2023) ...................................................................... 37

*Nunes v. Cable News Network, Inc.*,
    31 F.4th 135 (2d Cir. 2022) ..............................................................24, 37

*Nunes v. Lizza*,
    12 F.4th 890 (8th Cir. 2021) ...........................................................*passim*

*O'Hara v. Storer Commc'ns, Inc.*,
    231 Cal. App. 3d 1101 (1991) .................................................................. 42

*Olson v. City of North Liberty*,
    451 F. Supp. 3d 1010 (S.D. Iowa 2020) ............................................24, 25

*Parker v. Hennepin Cnty. Dist. Ct., Fourth Jud. Dist.*,
    285 N.W.2d 81 (Minn. 1979) ................................................................... 20

*Penrose Hill, Ltd. v. Mabray*,
    479 F. Supp. 3d 840 (N.D. Cal. 2020)................................................2, 39

*Perlman v. Vox Media, Inc.*,
    No. CV-N19C-07-235, 2020 WL 3474143
    (Del. Super. Ct. June 24, 2020) ............................................................... 39

*Phila. Newspapers, Inc. v. Hepps*,
    475 U.S. 767 (1986) ..........................................................................*passim*

*Price v. Viking Penguin, Inc.*,
    881 F.2d 1426 (8th Cir. 1989).................................................................. 45

*Reed v. City of St. Charles, Mo.*,
    561 F.3d 788 (8th Cir. 2009) ................................................................... 22

*Reeves v. Am. Broad. Cos.*,
    719 F.2d 602 (2d Cir. 1983)..................................................................... 35

*Roberts v. McAfee, Inc.*,
    660 F.3d 1156 (9th Cir. 2011)...........................................................39, 41

*Rudin v. Dow Jones & Co.*,
    510 F. Supp. 210 (S.D.N.Y. 1981)........................................................... 38

x

*Ruffin-Steinback v. dePasse*,
   267 F.3d 457 (6th Cir. 2001) .................................................... 35

*Saenz v. Playboy Enters., Inc.*,
   841 F.2d 1309 (7th Cir. 1988) ...........................................45, 46

*Salyer v. S. Poverty L. Ctr., Inc.*,
   701 F. Supp. 2d 912 (W.D. Ky. 2009).................................40, 41

*Sarver v. Chartier*,
   813 F.3d 891 (9th Cir. 2016) .................................................... 37

*Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*,
   558 F.3d 731 (8th Cir. 2009) .............................33, 38, 42, 47

*Schlegel v. Ottumwa Courier, Div. of Lee Enters. Inc.*,
   585 N.W.2d 217 (Iowa 1998) ........................................ 1, 30, 31

*Schuster v. U.S. News & World Report, Inc.*,
   602 F.2d 850 (8th Cir. 1979) .................................................... 15

*Secrist v. Harkin*,
   874 F.2d 1244 (8th Cir. 1989) ................................................. 44

*Selle v. Pierce*,
   494 N.W.2d 634 (S.D. 1993).................................................... 35

*Sellers v. Mineta*,
   350 F.3d 706 (8th Cir. 2003) .................................................... 57

*Shepard v. TheHuffingtonPost.com*,
   509 F. App'x 556 (8th Cir. 2013) ............................................ 40

*Spacecon Specialty Contractors, LLC v. Bensinger*,
   713 F.3d 1028 (10th Cir. 2013)............................................... 50

*Split Rail Fence Co. v. United States*,
   852 F.3d 1228 (10th Cir. 2017)..................................... 1, 17, 22

*St. Jude Med. S.C., Inc. v. Tormey*,
   779 F.3d 894 (8th Cir. 2015) ..............................................3, 56

Appellate Case: 23-2322    Page: 12    Date Filed: 01/19/2024 Entry ID: 5355052

*Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*,
No. 02 CV 2258, 2007 WL 935703 (S.D. Cal. Mar. 7, 2007).................... 39

*Tah v. Glob. Witness Publ'g, Inc.*,
991 F.3d 231 (D.C. Cir. 2021) ................................................ 50

*Toney v. WCCO Television, Midwest Cable & Satellite, Inc.*,
85 F.3d 383 (8th Cir. 1996) .................................................. 55

*Torgerson v. City of Rochester*,
643 F.3d 1031 (8th Cir. 2011) ................................................ 15

*Traditional Cat Ass'n, Inc. v. Gilbreath*,
118 Cal. App. 4th 392 (2004) ................................................. 39

*Trendmood, Inc. v. Rabinowitz*,
No. 20-CV-10877, 2021 WL 5277441
(C.D. Cal. Aug. 31, 2021) .................................................... 42

*United States v. Cobo-Cobo*,
873 F.3d 613 (8th Cir. 2017) ................................................. 17

*United States v. Foothill Packing, Inc.*,
11 OCAHO 1240, 2015 WL 329579 (Jan. 13, 2015)..........................10, 18

*United States v. New El Rey Sausage Co.*,
1 OCAHO 66, 1989 WL 433853 (July 7, 1989)................................... 18

*United States v. Occupational Res. Mgmt. Staffing, Inc.*,
10 OCAHO 1166, 2013 WL 1918850 (Jan. 23, 2013)..........................9, 18

*United States v. Sunshine Bldg. Maint.*,
7 OCAHO 997, 1998 WL 746015 (May 4, 1998) ........................ 10, 18, 20

*Unsworth v. Musk*,
No. 18-CV-08048, 2019 WL 8220721
(C.D. Cal. Nov. 18, 2019) .................................................... 41

*Valentine v. C.B.S., Inc.*,
698 F.2d 430 (11th Cir. 1983)................................................. 27

*Walker v. City of Okla. City*,
No. 98-6457, 2000 WL 135166 (10th Cir. Feb. 7, 2000).......................... 27

Appellate Case: 23-2322   Page: 13   Date Filed: 01/19/2024 Entry ID: 5355052

*Wells v. Liddy*,
　186 F.3d 505 (4th Cir. 1999) ......................................................... 35

*Wiley v. Ohio/Okla. Hearst Argyle Television, Inc.*,
　33 F. App'x 434 (10th Cir. 2002) .................................................. 27

*Williams v. United States*,
　71 F.3d 502 (5th Cir. 1995) .......................................................... 35

*Wright v. Brooke Grp. Ltd.*,
　652 N.W.2d 159 (Iowa 2002) ....................................................... 24

*Yates v. Iowa W. Racing Ass'n*,
　721 N.W.2d 762 (Iowa 2006) ....................................................... 18

*Yeager v. Bowlin*,
　693 F.3d 1076 (9th Cir. 2012) ...................................................... 41

**Statutes**

8 U.S.C. § 1324a ....................................................................... 1, 9

8 U.S.C. § 1324a(b)(1)(A) ............................................................. 18

18 U.S.C. § 2 ......................................................... 10, 18, 19, 23

18 U.S.C. § 371 ............................................................................ 23

Cal. Civ. Code § 48a(1) ................................................................ 41

Cal. Civ. Code § 48a(d)(2) ........................................................... 42

Cal. Civ. Code § 3425.3 ................................................................ 39

Iowa Code § 706.1 ....................................................................... 24

**Other Authorities**

8 C.F.R. § 274a.1(l)(1) ................................................................. 18

8 C.F.R. § 274a.2(a)(3) ................................................................. 18

Fed. R. Civ. P. 56(a) .................................................................... 15

Appellate Case: 23-2322　　Page: 14　　Date Filed: 01/19/2024 Entry ID: 5355052

Fed. R. Civ. P. 72(a) ...................................................................3, 56

Fed. R. Evid. 801 ........................................................................ 31

Fed. R. Evid. 802 ........................................................................ 31

Restatement (Second) of Conflict of Laws § 145(2) ...................................... 34

Restatement (Second) of Conflict of Laws § 150(2) .................................34, 35

Restatement (Second) of Conflict of Laws § 152, cmt. d.............................. 34

Appellate Case: 23-2322   Page: 15   Date Filed: 01/19/2024 Entry ID: 5355052

# COUNTERSTATEMENT OF ISSUES[1]

## The NuStar Appellants

1.	Point I.A: Whether the district court correctly concluded based on undisputed facts that it was not materially false for Appellees to report that the NuStar Appellants knowingly employed undocumented workers. *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775 (1986); 8 U.S.C. § 1324a; *Split Rail Fence Co. v. United States*, 852 F.3d 1228, 1243 (10th Cir. 2017).

2.	Point I.B: Whether, as an independent basis to affirm, the district court correctly concluded based on undisputed facts that Appellees were not negligent for reporting that the NuStar Appellants knowingly employed undocumented workers. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974); *Brown v. Hearst Corp.*, 54 F.3d 21, 26 (1st Cir. 1995).

3.	Point I.C: Whether Appellees are independently entitled to summary judgment because the NuStar Appellants failed to identify any evidence of damage to their reputations. *Schlegel v. Ottumwa Courier, Div. of Lee Enters. Inc.*, 585 N.W.2d 217 (Iowa 1998).

---

[1]	Appellants' 14 assignments of error are confusing. Appellees have reframed the issues into eight points: Three concerning the NuStar Appellants' case, and five concerning the Congressman's case.

Appellate Case: 23-2322     Page: 16     Date Filed: 01/19/2024 Entry ID: 5355052

**The Congressman**

4.      Point II.A: Whether the district court correctly concluded the Congressman's claim, limited to Lizza's sharing of a hyperlink to the Article, fails under applicable California law both because (a) sharing the hyperlink was not a "republication" of the Article, and (b) the Congressman put forth no evidence of "special damages," to which he was limited. *Fuqua Homes, Inc. v. Beattie*, 388 F.3d 618 (8th Cir. 2004); *Penrose Hill, Ltd. v. Mabray*, 479 F. Supp. 3d 840, 852 (N.D. Cal. 2020); *Gomes v. Fried*, 136 Cal. App. 3d 924 (1982).

5.      Point II.B: Whether, as another independent basis to affirm, the district court correctly concluded the Congressman failed to show a genuine issue of material fact that Lizza intended the Article to imply the Congressman conspired with others to hide NuStar's reliance on undocumented workers. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Janklow v. Newsweek, Inc.*, 759 F.2d 644, 649 (8th Cir. 1985); *Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 681-82 (9th Cir. 1990); *De Havilland v. FX Networks, LLC*, 21 Cal. App. 5th 845, 869-70 (2018).

6.      Point II.C: Whether, as an alternative basis to affirm, the Congressman failed to put forth "clear and convincing" evidence that Lizza knew the alleged implication was false, where the undisputed record showed Lizza did not understand the Congressman's original complaint to deny the

Appellate Case: 23-2322     Page: 17     Date Filed: 01/19/2024 Entry ID: 5355052

implication, and regardless, Lizza would not have credited a bald denial in light of his extensive reporting. *Anderson*, 477 U.S. at 248; *Edwards v. Nat'l Audubon Soc'y, Inc.*, 556 F.2d 113 (2d Cir. 1977).

7.    Point II.D: Whether, as another basis to affirm, the Congressman's claim for defamation by implication, based solely on the juxtaposition of true facts (as opposed to false statements and/or material omissions), is unconstitutional (and regardless, the Congressman could not prove that the implication is materially false). *Hepps*, 475 U.S. at 775; *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974); *Janklow*, 759 F.2d at 649.

8.    Point III: Whether this Court lacks jurisdiction to review a non-dispositive pre-trial discovery order by the magistrate judge that was never appealed to the district judge (and whether the order was a gross abuse of discretion in any event). Fed. R. Civ. P. 72(a); *St. Jude Med. S.C., Inc. v. Tormey*, 779 F.3d 894, 902 (8th Cir. 2015).

3

# <u>COUNTERSTATEMENT OF THE CASE</u>[2]

Appellants' Brief ignores the dispositive evidence in this case, including Appellants' own records and testimony. Their three-paragraph recitation of facts, Br. 22-24, is mostly comprised of two lengthy sentences that make argumentative, conclusory assertions.

For a description of the factual record and procedural history, the Court may refer to the district court's Order. It reflects the court's exhaustive review of the record. Here, Appellees describe the Article at issue and pertinent procedural history.

## A. The Article.

Hearst publishes *Esquire* as a magazine and at Esquire.com. (App. 880-81; R.Doc. 138-1, at 14-15.) Lizza is an experienced political reporter who, from June 2018 to June 2019, was a freelance writer with *Esquire*. (App. 885-86; R.Doc. 138-1, at 19-20.)

---

[2]     "Add. __" refers to Appellants' Addendum. "App. __" refers to Appellants' Appendix. "Defs.' App. __" refers to Appellees' Appendix. "R.Doc. __" refers to the record in *Devin G. Nunes v. Ryan Lizza et al.*, 5:19-cv-04064-CJW (N.D. Iowa). "R.Doc. (*NuStar*) __" refers to the record in *NuStar Farms, LLC et al. v. Ryan Lizza et al.*, 5:20-cv-04003-CJW (N.D. Iowa).

For "Add." cites, pin-cites are to the page number of *this Court's* ECF-generated conforming stamp. For "R.Doc." cites, pin-cites are to the page number of *the district court's* ECF-generated conforming stamp.

Appellate Case: 23-2322     Page: 19     Date Filed: 01/19/2024 Entry ID: 5355052

For *Esquire*, Lizza investigated the Nunes farm in Tulare, California, core to the Congressman's political identity. (App. 948; R.Doc. 138-1, at 82.) Lizza had reason to believe the Congressman's father and brother moved over a decade before to Iowa, where, according to Lizza's research, dairies often rely on undocumented labor. (App. 892-94, 908-910, 917-18, 930-32; Defs.' App. 219-20; R.Doc. 138-1, at 26-28, 42-44, 51-52, 64-66; R.Doc. 118-193, at 4-5.)

"The article begins with the words: 'Devin Nunes has a secret,'" "namely, that '[t]he Nunes family dairy of political lore . . . isn't in California. It's in Iowa.'" *Nunes v. Lizza*, 12 F.4th 890, 896 (8th Cir. 2021). The Article observes, "[a]s far as [Lizza] could tell . . . neither [Devin] Nunes nor the local California press that covers him had ever publicly mentioned that his family dairy is no longer in Tulare." (Defs.' App. 271; R.Doc. 118-193, at 56.) Lizza "went to Sibley," Iowa to see why. (*Id.*)

The Article describes Lizza's time reporting in Sibley, which overwhelmingly supported Donald Trump in 2016. (Defs.' App. 270-76; R.Doc. 118-193, at 55-61.) Many interviewees supported Trump but were uneasy about his hardline positions on immigration. (*Id.*; App. 908; R.Doc. 138-1, at 42.) Lizza learned why that may be: "Midwestern dairies tend to run on undocumented labor," and farmers claimed "the system is built on easily

5

obtained fraudulent documents." (App. 908-09; R.Doc. 138-1, at 42-43.)
Because "[m]ost workers start at fourteen or fifteen dollars an hour," "[i]f
dairies had to use legal labor, they would likely have to raise that to eighteen or
twenty dollars, and many dairies wouldn't survive," sources told Lizza. Lizza
noted the "hypocrisy" that "Trump's and [former Rep. Steve] King's rural-
farm supporters embrace anti-immigrant politicians while employing
undocumented immigrants." (Defs.' App. 273, 275; R.Doc. 118-193, at 58,
60.)

Lizza's reporting file was produced in discovery. It included recordings
of dozens of interviews of at least 24 sources over three days of reporting in
and near Sibley. (App. 601, 900-08; Defs.' App. 139-42, 228-48, 310-96;
R.Docs. 118-95, 118-97, 118-98, 118-99; R.Doc. 118-193, at 13-33, 95-100;
R.Doc. 118-194, at 1-81; R.Doc. 138-1, at 34-42.) "Source 1," who "was
deeply connected in the local Hispanic community," was interviewed multiple
times. In the Article, Lizza reports:

> According to two sources with firsthand knowledge,
> NuStar did indeed rely, at least in part, on
> undocumented labor. . . . [Source 1] had personally
> sent undocumented workers to Anthony Nunes Jr.'s
> farm for jobs. "I've been there and bring illegal people,"
> [Source 1] said, asserting that the farm was aware of
> their status. "People come here and ask for work, so I
> send them over there." When I asked how many people
> working at dairies in the area are documented
> citizens . . . "To be honest? None. One percent,

6

maybe."

(App. 910-11; Defs.' App. 140-41, 241-42; R. Doc. 118-97, at 4:51-5:20; R.Doc. 118-98, at 14:25-16:32; R.Doc. 138-1, at 44-45; R.Doc. 118-193, at 26.) The Article quotes "Source 2," who used to work at NuStar and admitted to Lizza in Spanish that he is "*ilegal*." (App. 915; Defs.' App. 139, 243-44; R.Doc. 118-95, at 00:48-01:53, 03:13-3:57; R.Doc. 118-193, at 28-29; R.Doc. 138-1, at 49.) A third undocumented worker said nearly all employees on area dairy farms like NuStar are undocumented. (App. 916-17; Defs.' App. 141; R.Doc. 118-98, at 04:55-05:59; R.Doc. 138-1, at 50-51.)

Anthony Jr., on the Congressman's advice, "did not respond to numerous requests for interviews" and rebuffed Lizza at his house. Calls to NuStar went unreturned. (App. 922-24; R.Doc. 138-1, at 56-58.) The Congressman did not respond to requests for comment. (*Id.*)

The Article was reviewed at Hearst by multiple editors and by a fact-checker who spent two weeks fact-checking the Article. (Defs.' App. 51-63, 209-15; R.Docs. 118-191, 118-192.) It was published on Esquire.com on September 30, 2018. (App. 894-96; R.Doc. 138-1, at 28-30.) Lizza tweeted a link to the Article that same day. (*Id.*) It was printed in *Esquire*'s November 2018 issue. (*Id.*)

7

## B.     The Congressman's Case.

In September 2019, the Congressman sued for defamation.[3] In August 2020, the district court dismissed his case. The Congressman appealed.

In September 2021, this Court affirmed the dismissal of all the Congressman's claims of defamation (express or implied) arising from the publication of the Article on September 30, 2018. *Nunes*, 12 F.4th at 899. It also affirmed dismissal of all claims of express defamation. *Id.* at 896.

However, this Court allowed a defamation by implication claim to proceed on a limited theory: That Appellees defamed the Congressman by implying he "conspired to hide [NuStar Farm]'s use of undocumented labor" when, on November 20, 2019, Lizza shared a hyperlink to the Article on Twitter (the "Link"). *Id.* at 897, 901. Under Iowa law (which this Court assumed applied, without deciding), for purposes of a Rule 12(b)(6) motion, the claim was "plausibly alleged." *Id.* at 899.

## C.     The NuStar Appellants' Case.

The NuStar Appellants prosecuted a parallel defamation suit, filed in

---

[3]     His original complaint included a claim for civil conspiracy. This was omitted from his operative third amended complaint. The Congressman's original complaint also named as a defendant HMI. HMI does not publish *Esquire*. In all subsequent complaints, the Congressman named Hearst as a defendant, not HMI. On this appeal, the Congressman filed a letter representing he is not taking an appeal as against HMI.

Appellate Case: 23-2322     Page: 23     Date Filed: 01/19/2024 Entry ID: 5355052

January 2020. (Add. 26; App. 164; R.Doc. 149, at 8.) After motions to dismiss, their case advanced to discovery only on a claim that Appellees defamed them by falsely alleging "their knowing employment of undocumented laborers." (Add. 27; App. 165; R.Doc. 149, at 9.) Later, the district court consolidated the two cases and allowed the NuStar Appellants to amend their complaint to add a claim for defamation by implication (mirroring the Congressman's surviving claim). (Add. 28; App. 166; R.Doc. 149, at 10.)

### D. The Summary Judgment Ruling.

Appellees moved for summary judgment in September 2022. In April 2023, the district court entered its Order, granting Appellees' motion.

The first half of the Order describes the record. The undisputed evidence showed NuStar accepted at least six work authorization documents that were (i) expired at the time of acceptance or (ii) stated, on their face, they were not valid for work authorization. (App. 187, 189, 985-87, 996-97; Defs.' App. 111-38, 143-205; R.Docs. 118-45, 118-46, 118-49, 118-53, 118-56, 118-81, 118-100, 118-113; R.Doc. 138-1, at 119-21, 130-31; R.Doc. 149, at 31, 33.) The acceptance of facially invalid authorization documents is conclusive evidence of knowing undocumented hires in violation of the Immigration Reform and Control Act, 8 U.S.C. § 1324a ("IRCA"). *See, e.g.*, *United States v. Occupational Res. Mgmt. Staffing, Inc.*, 10 OCAHO 1166, 2013 WL 1918850, at *8-9 (Jan. 23,

2013) ("*O.R.M.*") (expired authorization imputed knowledge to employer that worker was unauthorized); *United States v. Foothill Packing, Inc.*, 11 OCAHO 1240, 2015 WL 329579, at *10 (Jan. 13, 2015); *United States v. Sunshine Bldg. Maint.*, 7 OCAHO 997, 1998 WL 746015, at *26 (May 4, 1998) (accepting SSN card stamped "Not Valid for Employment" was knowing hire violation).

These were not isolated instances of illegal hiring practices. For at least 289 Form I-9s (94% of those produced by NuStar), NuStar did not complete Section 2 as required by law.[4] (Add. 44; App. 182, 952-62, 965-66; Defs.' App. 162-63; R.Doc. 138-1, at 86-96, 99-100; R.Doc. 118-100, at 20-21; R.Doc. 149, at 26.) For at least 208 Form I-9s, NuStar did not sign and date Section 2, another substantive violation. (*Id.*) For at least 68 Form I-9s, NuStar did not fill out any part of the I-9 on time, sometimes waiting months or years after hire; the law requires completion within three days. NuStar's expert agreed these are serious substantive violations of the IRCA. (App. 966-68; Defs.' App.

---

[4]    As the district court explained, "[u]nder federal law, employers must use a Form I-9 to verify the identity and employment authorization of individuals hired by employers in the United States." (Add. 43-44; App. 181-82; R.Doc. 149, at 25-26.) "Section 2 of the Form I-9 requires the employer's signature and date attesting that they (1) 'have examined the document(s) presented by the above-named employee, (2) the above-listed document(s) appear to be genuine and to relate to the employee named, and (3) to the best of [the employer's] knowledge the employee is authorized to work in the United States.'" (*Id.*)

Appellate Case: 23-2322    Page: 25    Date Filed: 01/19/2024 Entry ID: 5355052

172-73; R.Doc. 118-100, at 30-31; R.Doc. 138-1, at 100-02.)

Seventy-six percent of NuStar's employees produced documents that did not match government records, according to information produced by the Social Security Administration ("SSA"). (App. 976; R.Doc. 138-1, at 110.) NuStar received two "no-match letters" from the SSA, each stating that the information for 74% of its employees did not match SSA records for 2018 and 2019. (Add. 47-48; App. 185-86, 977-82; R.Doc. 138-1, at 111-16; R.Doc. 149, at 29-30.) In response, NuStar did nothing. (*Id.*)

As Appellees' expert Claude Arnold explained, 239 employees (75%) "provided counterfeit [Resident Alien, state ID, or Social Security card] documents or did not provide documentation that satisfies employee verification requirements." (App. 982; Defs.' App. 166-67; R.Doc. 118-100, at 24-25; R.Doc. 138-1, at 116.) NuStar's expert Clete Samson did not dispute this. (*Id.*) Some of the most egregious examples are described in the Order. (Add. 49-53; App. 187-91; R.Doc. 149, at 31-35.)

Appellees deposed six long-time NuStar employees. In response to every question concerning their immigration status—and NuStar's awareness of their status—all asserted their Fifth Amendment rights. (Add. 53-57; App. 191-95, 1007-15; Defs.' App. 76-110; R.Docs. 118-13, 118-14, 118-15, 118-16, 118-17, 118-18; R.Doc. 138-1, at 141-49; R.Doc. 149, at 35-39.)

11

In its Order, in view of this undisputed record comprised of NuStar's employee records and testimony, the district court held the implied "assertion that NuStar knowingly used undocumented labor is substantially, objectively true," requiring summary judgment for Appellees on the NuStar Appellants' claim for defamation. (Add. 94-95; App. 232-33; R.Doc. 149, at 76-77.) Any implied "conspiracy" to hide this fact was substantially true; any such "conspiracy" would be no more defamatory than the true reporting that NuStar did, in fact, knowingly hire undocumented workers. (Add. 109-10; App. 247-48; R.Doc. 149, at 91-92.) The NuStar Appellants also failed to show Appellees negligently breached the professional standard of care. (Add. 97-98, 110; App. 235-36, 248; R.Doc. 149, at 79-80, 92.)

Regarding the Congressman's claim, the district court held California law applied. (Add. 101; App. 239; R.Doc. 149, at 83 n.27.) Under California law and on this record, the Link was not a "publication" of the Article, and there was no evidence of "special damages," to which the Congressman was limited. (Add. 104, 111-12; App. 242, 249-50; R.Doc. 149, at 86, 93-95.) The Congressman also failed to show Appellees intended to convey the defamatory implication. (Add. 116; App. 254; R.Doc. 149, at 98.)

Appellate Case: 23-2322    Page: 27    Date Filed: 01/19/2024 Entry ID: 5355052

## SUMMARY OF ARGUMENT

The Order should be affirmed. The district court reviewed the extensive record and concluded each of Appellants' claims fail for multiple, independently sufficient reasons. Appellants ignore the evidence and the court's reasoning.

Concerning the NuStar Appellants, the Order can be affirmed for at least three reasons. The district court correctly concluded the NuStar Appellants failed to show a genuine issue of material fact as to whether it was materially false to report they knowingly used undocumented workers (or "conspired" to do so). *Infra* Point I.A.

The district court also correctly concluded the NuStar Appellants failed to show a genuine issue of material fact that Appellees' reporting was negligent. Lizza gathered 1,100 pages of research and notes, conducted dozens of interviews with at least 24 sources, and provided Appellants multiple opportunities for comment. The NuStar Appellants did not explain how Appellees breached any applicable duty of care. *Infra* Point I.B.

As an alternative basis to affirm, the NuStar Appellants failed to create a material issue of fact that they sustained damage to their reputations. The allegations credited by the district court were not supported by admissible evidence and do not demonstrate reputational harm. *Infra* Point I.C.

13

Concerning the Congressman, the Order may be affirmed on at least five independent grounds. Under applicable California law, *infra* Point II.A.1, the Link did not publish the Article, *infra* Point II.A.2. Moreover, there is no evidence of the requisite "special damages." *Infra* Point II.A.3. The district court also correctly held no reasonable jury could find Lizza intended the Article to imply the Congressman conspired to hide that NuStar relies on undocumented workers. The unrebutted evidence, including Lizza's reporting file and testimony, shows he had no awareness the implication could be drawn from the Article. *Infra* Point II.B.

Alternatively, the Congressman failed to put forth "clear and convincing" evidence Lizza knew the alleged implication was false. Lizza did not understand the Congressman's original complaint to deny the implication, and Lizza would not have credited such a denial. *Infra* Point II.C. And where the reported facts are indisputably true and there is no material omission, defamation by implication claims are unconstitutional. A contrary ruling violates the First Amendment by punishing publication of the truth and substituting the court's editorial judgment for that of the speaker. Regardless, the Congressman did not carry his burden of showing the implication is materially false. *Infra* Point II.D.

14

# ARGUMENT

Decisions granting summary judgment are reviewed *de novo. Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*).

Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Torgerson*, 643 F.3d at 1042 (citations omitted). The Court "may affirm a judgment on any ground supported by the record." *Adam & Eve Jonesboro, LLC v. Perrin*, 933 F.3d 951, 958 (8th Cir. 2019).

Summary judgment "is not disfavored and is designed for every action." *Torgerson*, 643 F.3d at 1043. It "may be particularly appropriate in an action for defamation," *Lauderback v. Am. Broad. Cos.*, 741 F.2d 193, 198 (8th Cir. 1984) (citation omitted), as "the cost of defending a protracted lawsuit can chill first amendment rights," *Schuster v. U.S. News & World Report, Inc.*, 602 F.2d 850, 855 (8th Cir. 1979).

The district court described the elements of a defamation claim under Iowa and California laws. (Add. 83-88, 101-05; App. 221-26, 239-43; R.Doc. 149, at 65-70, 83-87.) In particular:

15

1. The plaintiff bears the burden of proving all elements, including falsity. (Add. 83; App. 221; R.Doc. 149, at 65.) This is a constitutional requirement. *Hepps*, 475 U.S. at 775. Minor inaccuracies are not enough; the plaintiff must prove the challenged statement is materially false. (Add. 87; App. 225; R.Doc. 149, at 69.)

2. The plaintiff must prove the statement was made with the requisite level of fault. Private figure plaintiffs must prove a negligent breach of the professional standard of care. (Add. 83; App. 221; R.Doc. 149, at 65.) A public official like the Congressman must prove, by clear and convincing evidence, that the statement or implication was made with "actual malice"—meaning the defendant, intending to convey the false statement or implication, did so knowing it was false or recklessly disregarding its truth. (Add. 88, 103-04; App. 226, 241-42; R.Doc. 149, at 70, 85-86.)

3. The plaintiff bears the burden of proving they were damaged. (Add. 83, 86, 105, 111; App. 221, 224, 243, 249; R.Doc. 149, at 65, 68, 87 n.30, 93 n.31.) Both Iowa law (for the NuStar Appellants) and California law (for the Congressman) are demanding, though in different ways. *Compare infra* Point I.C, *with* Point II.A.3.

16

# I. THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT ON THE NUSTAR APPELLANTS' CLAIMS

## A. The NuStar Appellants Failed to Create a Genuine Issue of Fact that the Article Was Materially False.

### 1. *The NuStar Appellants Knowingly Used Undocumented Labor.*

The NuStar Appellants indisputably accepted at least six employee work authorization documents that, on their face, could not validly authorize work in the United States. *Supra* p. 9. They committed at least 289 substantive federal immigration law violations. *Supra* p. 10. Seventy-six percent of NuStar's 319 employees' social security numbers did not match SSA records. *Supra* p. 11. Six long-term NuStar employees invoked their Fifth Amendment rights to refuse to answer questions about what NuStar knew of their immigration status. *Id.*

After reviewing the evidence, the district court correctly concluded the "NuStar [Appellants] do not show a genuine issue of material fact as to falsity." (Add. 95; App. 233; R.Doc. 149, at 77.) "The assertion that NuStar knowingly used undocumented labor is substantially, objectively true." (*Id.*)

***NuStar accepted facially invalid work authorization documents.*** The district court was guided by the IRCA and cases interpreting that statute. *United States v. Cobo-Cobo*, 873 F.3d 613, 615 (8th Cir. 2017); *Split Rail*, 852 F.3d at 1243. Under the IRCA, NuStar was required to verify every employee's identity and

17

work authorization at the time of hire. *Supra* p. 10 n.4. In Section 2 of Form I- 9, the employer "must attest, under penalty of perjury," "that it has verified" the employee's authorization by "examining" their documents, which must "reasonably appear[] on [their] face to be genuine." *See* 8 U.S.C. § 1324a(b)(1)(A); 8 C.F.R. § 274a.2(a)(3).

"Knowledge" under the IRCA may be shown through objective, external evidence, by a preponderance of the evidence. *See O.R.M.*, 2013 WL 1918850, at *8-9; 8 C.F.R. § 274a.1(l)(1); *United States v. New El Rey Sausage Co.*, 1 OCAHO 66, 1989 WL 433853, at *17 (July 7, 1989), *aff'd*, 925 F.2d 1153 (9th Cir. 1991).

NuStar hired at least six workers with expired or facially invalid work authorization documents. That is enough to establish a knowing hire violation, as a matter of immigration law.[5] *See O.R.M.*, 2013 WL 1918850, at *8-9; *Foothill Packing*, 2015 WL 329579, at *10; *Sunshine Bldg.*, 1998 WL 746015, at

---

[5]     The NuStar Appellants allege the Article is defamatory because it accuses them of violating the IRCA's prohibition on knowing undocumented hires; the IRCA is a directly relevant measure of NuStar's knowledge in this context. (App. 116-17; R.Doc. (*NuStar*) 188, at 15-16.) Importantly, in a defamation case, the *plaintiff* bears the burden of proving the statement was false, which it can only carry with specific, outcome-determinative evidence demonstrating verifiable falsity. *See Hepps*, 475 U.S. at 776-77; *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990); *Yates v. Iowa W. Racing Ass'n*, 721 N.W.2d 762, 771 (Iowa 2006).

*26. The NuStar Appellants ignore this point, which is dispositive of their claim.

*Substantive violations of immigration law.* Further evidence of NuStar's knowledge is found in its widespread refusal to comply with the law. NuStar failed to complete Section 2 of the Form I-9 for 289 employees. *Supra* p. 10. As NuStar's expert acknowledged, 208 times, no one at NuStar timely attested to the employer certification documented in Section 2. *Id.* Both parties' experts agreed, "at a minimum, the number and type of substantive Form I-9 violations is indicia of NuStar plaintiffs' constructive knowledge of hiring undocumented persons." (Add. 46; App. 184; R.Doc. 149, at 28.)

There were also hundreds of inconsistencies and indicia of fabrication among NuStar employees' proffered documents, like obvious misspellings of government agencies, conflicting dates of birth, and expired identification cards. (Add. 49-53; App. 187-91; Defs.' App. 183-99; R.Doc. 118-100, at 41-59; R.Doc. 149, at 31-35.) NuStar's attorney who audited their files in October 2018, Amanda Bahena, acknowledged such errors "raise[d] questions" (App. 1005; R.Doc. 138-1, at 139), and advised NuStar that some workers required follow-ups and "hard conversations" regarding their documents. (Add. 55; App. 193, 1017-18; R.Doc. 138-1, at 151-52; R.Doc. 149, at 37.) There is no evidence NuStar followed up or had any "hard conversations."

19

NuStar's systemic failure to follow the IRCA, which evidences its knowledge, had predictable results: 76% of NuStar's employees did not present NuStar with names, birthdates, or social security numbers that matched the SSA's records. *Supra* p. 11; *see Sunshine Bldg.*, 1998 WL 746015, at *20 (I-9 violations "coupled with circumstantial evidence of a conscious avoidance of acquiring knowledge as to the identification and status of one's employees" can show knowing hire). NuStar received two letters from the SSA informing it that a majority of its workforce provided SSNs that did not match SSA records. *Supra* p. 11. NuStar took no action in response. *Id.*

**NuStar employees pleaded the Fifth.** In August 2021, six of NuStar's long-time employees invoked their Fifth Amendment rights to refuse to answer any question concerning their (i) proffered documents; (ii) authorizations to work in the United States; and (iii) awareness of or communications about NuStar's knowledge of their status. *Supra* p. 11.

When employees of a *plaintiff*—which chose to bring suit and put its employees' status at issue—plead the Fifth, courts grant adverse inferences if not outright dismissal. *See Brink's Inc. v. City of N.Y.*, 717 F.2d 700, 709 (2d Cir. 1983); *see also Lyons v. Johnson*, 415 F.2d 540, 541 (9th Cir. 1969); *Parker v. Hennepin Cnty. Dist. Ct., Fourth Jud. Dist.*, 285 N.W.2d 81, 83 (Minn. 1979). The district court correctly reasoned that NuStar's employees' invocation of the

20

Fifth Amendment, with other record evidence, prevented the NuStar Appellants from meeting their burden to prove falsity. *Hepps*, 475 U.S. at 775. The NuStar Appellants ignore this.

    ***The NuStar Appellants' Arguments.*** Instead, they point to 65 paragraphs in their response to Appellees' statement of undisputed facts, arguing they "denied and dispute that they knowingly employed undocumented workers." Br. 39. But the district court "read[] all 65 of" these paragraphs and observed they were largely "plaintiffs' expert's legal conclusions without giving the Court any facts with which to evaluate whether NuStar plaintiffs have met their burden of showing a genuine issue as to falsity of defendants' statements." (Add. 93; App. 231; R.Doc. 149, at 75.)

    The NuStar Appellants do not explain how the facts referenced in these paragraphs create a genuine issue of material fact, particularly in view of case law showing they committed knowing hires under the IRCA.[6]

    Beyond that, the NuStar Appellants point to Anthony Jr.'s blanket declaration that NuStar did not know its workers were unauthorized. Br. 37.

---

[6]     Though the district judge acknowledged when Appellants claimed they "disputed" facts proffered by Appellees, Br. 33-34 n.12, that does not mean Appellants identified admissible evidence creating genuine issues of material fact. Appellants' fact responses are addressed in Appellees' reply statement of undisputed facts. (App. 867-1101; R.Doc. 138-1.) Appellees respectfully refer the Court to that document.

This is immaterial. An employer cannot claim subjective ignorance when confronted with facially invalid documents—as happened here—by saying it did not read or understand the documents. *See Split Rail*, 852 F.3d at 1243 ("[T]he employer is not entitled to cultivate deliberate ignorance . . . ." (quoting *Foothill Packing*, 2015 WL 329579, at *7)). And unsupported "self-serving" denials are insufficient to create a genuine issue of material fact. *See, e.g.*, *Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 790-91 (8th Cir. 2009); *Montgomery v. Risen*, 875 F.3d 709, 712, 714-15 (D.C. Cir. 2017).[7]

Also, Anthony Jr. testified he had no responsibility for verifying documents or hiring employees. He lacks a foundation for offering testimony about NuStar's hiring practices. (App. 878-79, 970; R.Doc. 138-1, at 12-13, 104.) Tellingly, Appellants did *not* submit affidavits from the persons who *did*

---

[7] Interestingly, Anthony Jr., citing the "Bracero program," testified it was "the government's fault for not taking care of this problem," and "[t]hey could take care of this problem and make these people legal to come in here and do this." (App. 984-85; R.Doc. 138-1, at 118-19.) Likewise, the Congressman has agreed that a "permit system" akin to a "Bracero program" is part of a "solution" to the country's immigration problems. (App. 1042-43; R.Doc. 138-1, at 176-77.) The Bracero program was an effort by the federal government, from 1942 to 1964, to "eas[e] labor storages by allowing millions of Mexican nationals to legally enter the United States to work on short-term contracts, often in the field of agriculture." (Add. 43; App. 181; R.Doc. 149, at 25, n.12.) In another acknowledgment, Lori Nunes—NuStar's bookkeeper, responsible for ensuring I-9s were completed—testified she did not know if she wanted to learn if NuStar's employees were authorized. (App. 974; R.Doc. 138-1, at 108.)

Appellate Case: 23-2322   Page: 37   Date Filed: 01/19/2024 Entry ID: 5355052

hire and onboard NuStar's employees: Lori Nunes and Plaintiff Anthony III (NuStar's corporate representative).

Lastly, the "legion" of supposed falsehoods the NuStar Appellants cite, Br. 35-36, are immaterial. On falsity, what matters are the actual employment practices of the NuStar Appellants, which they appear to acknowledge were "proven" to be as reported in the Article. Br. 40. Statements by sources (which the Appellants mischaracterize, *infra* pp. 28-30) are irrelevant.

### 2. Any Implication the NuStar Appellants "Conspired" to Hide the Hiring of Undocumented Workers Is Substantially True.

The NuStar Appellants argue that, though the "knowing employment of undocumented workers" is "proven," the "actual misconduct implied in the Article—conspiracy (18 U.S.C. § 371) or aiding and abetting (18 U.S.C. § 2)— is of a different type," subjecting them to greater opprobrium. Br. 40-42.

The district court correctly rejected this. The aim of the alleged "conspiracy" was the hiring of undocumented workers. "[K]nowing employment of undocumented laborers is essential and central to the implication being defamatory." (Add. 109-10; App. 247-48; R.Doc. 149, at 91- 92.) The "defendants' recitation of facts" "paint[s] the implication as substantially true," and the NuStar Appellants failed to point to any evidence to the contrary. (*Id.*) Because the record supported the implication of conspiracy, and the implication did not hold the NuStar Appellants out to

23

greater opprobrium than that of the proven truth, the court granted summary

judgment on Count II of the NuStar Appellants' complaint. (*Id.*)

This was correct. A "conspiracy" element itself adds no defamatory

"sting" because conspiring is only made wrongful by an independent wrongful

act. *See Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 172, 174 (Iowa 2002);

*Deeds v. City of Marion*, 914 N.W.2d 330, 350 (Iowa 2018); Iowa Code § 706.1.

Even if Appellees had accused the NuStar Appellants of a formal conspiracy,

hiring undocumented workers would be the "actionable underlying act"

conferring the defamatory sting. *Deeds*, 914 N.W.2d at 350. Reasonable minds

could not differ that the defamatory "gist or sting" is the same as between

knowingly hiring undocumented workers and "conspiring" to knowingly hire

undocumented workers. *Behr v. Meredith Corp.*, 414 N.W.2d 339, 342-44 (Iowa

1987) (favorably citing "a number of cases in which substantial truth has been

successfully asserted as a matter of law by a libel defendant who misstated a

plaintiff's involvement in the criminal justice system").[8]

---

[8]     The cases cited by the NuStar Appellants are inapposite. Br. 8, 40-42.
*Blankenship v. Napolitano* concerned the difference between accusing someone
of a felony and a misdemeanor, 451 F. Supp. 3d 596 (S.D.W. Va.), *on
reconsideration in part sub nom. Blankenship v. Fox News Network, LLC*, 510 F.
Supp. 3d 356 (S.D.W. Va. 2020), and, ultimately, Blankenship lost this case,
*Blankenship v. NBCUniversal, LLC*, 60 F.4th 744 (4th Cir. 2023), *cert. denied*, No.
22-1125, 601 U.S. ----, 2023 WL 6558383 (Oct. 10, 2023). In *Olson v. City of
North Liberty*, it was not substantially true to say an officer "'lost it' and was
taking medication for those out of touch with reality," suggesting "insanity,"

24

**B.** **The NuStar Appellants Failed to Show Appellees Negligently Breached the Applicable Standard of Care.**

The record shows "defendants sought to discover the true facts through an investigation." (Add. 97-98; App. 235-36; R.Doc. 149, at 79-80.) The NuStar Appellants failed to demonstrate a genuine issue of material fact as to professional negligence, having "only stated that negligence occurred," "cit[ing] a handful of facts without any reference to what those facts mean in relation to a standard of care." (*Id.*)

This holding was correct. Lizza conducted an extensive investigation. He reasonably relied on research and well-placed sources, including area farmers, an undocumented worker who had worked at NuStar, and a person deeply connected to Sibley's undocumented community. *Supra* pp. 6-7. And though overwhelming evidence demonstrated NuStar used undocumented workers, the Article let the readers draw their own conclusions. (Defs.' App. 276; R.Doc. 118-193, at 61 ("Is it possible the Nuneses have nothing to be seriously concerned about? Of course . . . .").)

On appeal, the NuStar Appellants mischaracterize the law and evidence.

<u>First</u>, they get the burden wrong. They blame Appellees for failing to put

---

when the officer was taking medication for PTSD after being shot in the line of duty. 451 F. Supp. 3d 1010, 1025-27 (S.D. Iowa 2020).

forth "the exact standard that is applied in evaluating negligence of a professional journalist." Br. 5, 42-43. *Plaintiffs* bear the burden of proving fault. There can be no liability without proof of fault, *Gertz*, 418 U.S. at 347-48; states can require more than negligence for private figures, *id.*; and Iowa requires a private figure defamation plaintiff to prove a media defendant violated the standard of care applicable to a professional journalist, *Johnson v. Nickerson*, 542 N.W.2d 506, 511 (Iowa 1996).

Regardless, the district court made clear the standard of care for journalists is *not* perfection. (Add. 98; App. 236; R.Doc. 149, at 80.) The NuStar Appellants' argument is, at best, nitpicking and "[p]ointing to isolated instances of errors," which does not satisfy their burden. (*Id.*)

Second, the district court did not "impermissibly weigh[ the] evidence." Br. 42-43. It reviewed relevant audio recordings of interviews and Lizza's extensive notes and held "no reasonable jury could find" Appellees negligent in failing to adhere to any professional journalism standard. (Add. 98; App. 236; R.Doc. 149, at 80.) The NuStar Appellants ignore the many cases affirming summary judgment for lack of negligence where, as here, the evidence supporting good faith reporting is "overwhelming," the plaintiff identified "no significant inaccuracies," "several individuals . . . repeatedly reviewed" the Article before publication, the reporter spoke to multiple sources

26

and "repeatedly tried to interview" plaintiff but was stonewalled, and/or the plaintiff otherwise prevented an investigation. *Brown*, 54 F.3d at 26; *Wiley v. Ohio/Okla. Hearst Argyle Television, Inc.*, 33 F. App'x 434, 437 (10th Cir. 2002); *Walker v. City of Okla. City*, No. 98-6457, 2000 WL 135166, at *11 (10th Cir. Feb. 7, 2000); *Middleton v. Sutton*, 73 F.3d 355 (1st Cir. 1996); *Kendrick v. Fox Television*, 659 A.2d 814, 823-24 (D.C. 1995); *Fuchs v. Scripps Howard Broad. Co.*, 868 N.E.2d 1024, 1039-40 (Ohio Ct. App. 2006); *Valentine v. C.B.S., Inc.*, 698 F.2d 430, 432 (11th Cir. 1983); *Karp v. Miami Herald Publ'g Co.*, 359 So. 2d 580, 582 (Fla. Dist. Ct. App. 1978).

Third, the NuStar Appellants list nine purported errors by Appellees. Br. 43-45. Each is contrary to the undisputed record:

1.     The allegation that Appellees "intentionally violated Hearst's code of ethics," Br. 43, is unsupported. The NuStar Appellants reproduce "Hearst's code of ethics" with no explanation for how Appellees supposedly "intentionally violated" it.

2.     The argument that Lizza "l[ied] about the story Lizza was reporting" when he reached out for comment, Br. 44, is irrelevant and false. It is "not a material misstatement" for Lizza to say the article was about "immigration" and "the dairy industry," which was simply true. (Add. 96-97; App. 234-35; R.Doc. 149, at 78-79.)

27

3.     The suggestion that Appellees "l[ied] to sources," Br. 44, grossly misstates the record and is immaterial. As the court below found, the "alleged misstatements made by Lizza during interviews are more opinions or hunches than false assertions of fact." (Add. 97; App. 235; R.Doc. 149, at 79.)

4.     Appellees did not "knowingly fabricat[e] . . . and attribut[e] statements to sources that the sources never made, including that Source 1 brought 'illegal people' to NuStar, that Source 1 asserted that NuStar was 'aware of their status,' and that Source 2 was an 'undocumented' immigrant." Br. 44-45. Source 1 told Lizza she knows Anthony Jr., and volunteered: "I've been there [NuStar Farms] and bring people," "illegal people like everybody else . . . . I know that and he [Anthony Jr.] know that." (Defs.' App. 141, 241-42; R.Doc. 118-98, at 14:25-16:25; R.Doc. 118-193, at 26.) She explained, "people come here and ask for work, so I send them over there." (Defs.' App. 141; R.Doc. 118-98, at 16:25-16:32.) As for Source 2: When asked in Spanish if he was "*ilegal*," he answered affirmatively. (Defs.' App. 139, 243-44; R.Doc. 118-95, at 03:13-03:57; R.Doc. 118-193, at 28-29.)

5.     In arguing Appellees "conceal[ed] material facts from readers, including that Source 1 did not know the immigration status of the people she took 'there'," Br. 45, the NuStar Appellants cherry-pick one quote from Lizza's several interviews with Source 1 to misleadingly suggest Source 1

28

lacked knowledge of NuStar. The totality of the conversations allows no genuine dispute that Lizza possessed significant, credible evidence that Source 1 had firsthand knowledge of the use of undocumented labor at NuStar.[9]

6.     Appellees did not "fail[] to fact-check when Source 1 brought 'illegal people.'" Br. 45. Just before leaving Sibley, Lizza explained to Source 1 that she would be used as a source for the statement in the Article that NuStar was "aware of the status" of workers she had "brought" to the farm. (Defs.' App. 253; R.Doc. 118-193, at 38.) Source 1 confirmed that was accurate. (*Id.*)

7.     Appellees did not "destroy[] notes, emails, text messages and transcripts." Br. 45. The Congressman waited until a year after publication to complain about the Article. In the intervening time, some data was lost due to the regular operation of Hearst's document retention policies (which were suspended once this lawsuit was threatened). (App. 903-04; R.Doc. 138-1, at 37-38.) Appellees nevertheless produced Lizza's voluminous research and reporting file. *Supra* pp. 6-7.

---

[9]     (Defs.' App. 237-39, 241-44, 249-55; R.Doc. 118-193, at 22-24, 26-29, 34-40; *see generally* Defs.' App. 139-41; R.Doc. 118-95, 118-97, 118-98.) When Lizza asks, "so you send people who are illegal to NuStar?," Source 1 says she assumes they are illegal and, as quoted in the Article, explains in detail the basis for that understanding: *i.e.*, U.S. citizens are not willing to do farm work, which consists of long hours of physically demanding work offering meager pay and no benefits. (Defs.' App. 141; R.Doc. 118-98, at 16:32-17:35.)

Appellate Case: 23-2322     Page: 44     Date Filed: 01/19/2024 Entry ID: 5355052

8.     Appellees did not "engag[e] in a fraudulent editing process." Br. 45. The NuStar Appellants point to minor stylistic edits which did not alter the Article's meaning. (App. 924-27; R.Doc. 138-1, at 58-61.)

9.     Appellants' claim that Appellees "disregard[ed]" Appellants' "retraction demands and republish[ed] the Article knowing that the Article misrepresented the contents of the audiotape recordings of source interviews," Br. 45, finds no support in the record, *see infra* Point II.C.

## C.     The NuStar Appellants Failed to Put Forth Admissible Evidence of Reputational Harm.

"[T]o prevail in a defamation action against a media defendant, a plaintiff must 'prove some sort of cognizable injury, such as injury to reputation.'" *Bierman v. Weier*, 826 N.W.2d 436, 447 (Iowa 2013) (quoting *Johnson*, 542 N.W.2d at 513); *Schlegel*, 585 N.W.2d at 222-26. Other harms, such as emotional distress, are considered "parasitic" damages under Iowa law and are not recoverable absent a showing of reputational harm. *See id.*; *Bierman*, 826 N.W.2d at 462-63; *Johnson*, 542 N.W.2d at 509, 513.

The district court credited three unsupported allegations as evidence of "reputational harm." On this, the court erred. First, there is no admissible evidence of "negative reviews" and phone calls "expressing negative opinions" of NuStar. The lower court credited Anthony Jr.'s "aware[ness]" of calls and comments on social media by unidentified third parties. (App. 828-30; Defs.'

30

App. 71-74;; R.Doc. 118-8, at 16-19; R.Doc. 131-4, at 8-10.) This inadmissible hearsay, *see* Fed. R. Evid. 801, 802, is not probative: Under Iowa law, the NuStar Appellants were required to show persons (i) read the Article, then (ii) believed NuStar knowingly hired undocumented workers, and (iii) thought less of the NuStar Appellants because of that. *Bierman*, 826 N.W.2d at 462-63. Anthony Jr.'s hearsay statement does not establish that.[10]

Second, that "some people . . . showed up on farm property" (Add. 90-91; App. 228-29; R.Doc. 149, at 72-73) is not evidence of reputational harm. As the district court acknowledged, "whether they went to the dairy farm to voice negative opinions is unclear." (*Id.*) Nothing in the record explains *why* these individuals showed up, or whether they thought less of NuStar for knowingly hiring undocumented workers.

Third, that it is unclear *why* NuStar's profits *increased* (*id.*) is not evidence of reputational *harm*. There is no evidence NuStar's profits would have increased *even more* but for the Article. *Schlegel*, 585 N.W.2d at 222-26.

Instead, the opposite is true: After the Article, NuStar's main customer told NuStar it supported them. (App. 1071; R.Doc. 138-1, at 205.) The NuStar

---

[10]    Most of these comments, referenced in his declaration, were on Twitter. Anthony Jr. "do[es] not use Twitter," and does not explain the basis for his knowledge of "hundreds of statements" made on that platform. (App. 829; R.Doc. 131-4, at 9.)

31

Appellants received support from the community. (App. 1063-65; R.Doc. 138-1, at 197-99.) A witness deposed by Appellants confirmed he would not think less of NuStar for knowingly hiring undocumented workers, as it is common knowledge the local economy runs on undocumented labor. (App. 1067-68; R.Doc. 138-1, at 201-02.) Anthony III admitted NuStar is uninterested in money damages. (App. 1072-73; R.Doc. 138-1, at 206-07.)

## II. THE COURT SHOULD AFFIRM SUMMARY JUDGMENT AS TO CONGRESSMAN NUNES'S CLAIM

As explained above, *supra* p. 8, the Congressman's case is limited to the theory that Appellees defamed him by implying he "conspired to hide [NuStar Farm]'s use of undocumented labor" when, on November 20, 2019, Lizza shared the Link on his Twitter feed. *Nunes*, 12 F.4th at 897, 901. The Congressman pleaded enough to survive the low threshold of a Rule 12(b)(6) motion, this Court held. Discovery showed his claim is meritless.

### A. Under Applicable California Law, the Congressman's Claim Fails.

The district court applied California law to the Congressman's claim, "adopt[ing] [Magistrate] Judge Roberts' analysis and findings on choice of law." (Add. 101; App. 239; R.Doc. 149, at 83, n.27.) The magistrate judge concluded (i) there is a true conflict between California law and Iowa law (which the Congressman claims applies), (ii) California law applies, and (iii)

32

the Congressman could not state a claim under California law. (Defs.' App. 13-23; R.Doc. 90, at 13-23.)

The Congressman did not object to the magistrate judge's ruling. On summary judgment, his only argument, raised in a footnote, was that Iowa law applies. (App. 611; R.Doc. 130, n.5.) He did not argue his claim could survive under California law. (*Id.*)

The district court was correct: California law applies. *Infra* subpoint 1. The Congressman waived any argument that his claim survives under California law. *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009).

Regardless, under California law, the Congressman's claim fails for multiple independent reasons: The Link was not a "publication" of the Article. *Infra* subpoint 2. And the Congressman does not have evidence of "special damages," as required. *Infra* subpoint 3. Also, Hearst did not share the Link. *Infra* subpoint 4.

### 1. *California Law Applies.*

The lower court found a "true conflict" between California and Iowa defamation law (Defs.' App. 13-15; R.Doc. 90, at 13-15), triggering a choice of law analysis. Applying Iowa's choice of law rules, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941), courts consider "the most significant

33

relationship" factors:

> (a) the place where the injury occurred,

> (b) the place where the conduct causing the injury occurred,

> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

> (d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) of Conflict of Laws § 145(2).

For content published in multiple states, "the state of most significant relationship will usually be the state where the person was domiciled." *Id.* Section 150(2). "[R]ules of defamation are designed to protect a person's interest in his reputation," and "the state where the plaintiff has suffered the greatest injury by reason of his loss of reputation" "will usually be the state of the plaintiff's domicil." *Id.*, cmt. e. The Congressman resides in California.

The district court applied Sections 145 and 153 (which is substantively identical to Section 150, *see id.* Section 152, comment d), and the Restatement's general "principles" in Section 6. (Defs.' App. 16-17; R.Doc. 90, at 16-17.)

Applying Section 145, the district court concluded the Congressman's "place of injury is California": His "reputation as a California congressman is central to his claim." (Defs.' App. 17; R.Doc. 90, at 17.) The second factor was neutral; Lizza's physical location when posting the Link "seem[ed] somewhat

34

immaterial." (Defs.' App. 17-18; R.Doc. 90, at 17-18.)

"[A]s between[] Iowa and California, th[e third] factor weighs in favor of applying California law because none of the parties reside in Iowa." (Defs.' App. 18; R.Doc. 90, at 18.) Section 153's statement that a plaintiff's domicile usually has "the most significant relationship" "weigh[ed] heavily in [the district court's] analysis." (*Id.*) "Courts applying Section 153 of the Restatement have overwhelmingly concluded that the law of the plaintiff's domicile applies to claims for invasion of privacy." (*Id.*) The same is true for Section 150. *See Fuqua Homes*, 388 F.3d at 622 (Section 150 creates "presumption" in favor of law of domicil for content "published on an internet website"; contacts in another state not "sufficiently significant" to "overcome" "presumption" even if "[s]ome of the conduct causing the injury occurred in" other state).[11]

---

[11]    *See, e.g.*, *McKee v. Cosby*, 874 F.3d 54, 60 (1st Cir. 2017) (applying law of plaintiff's domicile); *Kamelgard v. Macura*, 585 F.3d 334, 341-44 (7th Cir. 2009) (same); *Ruffin-Steinback v. dePasse*, 267 F.3d 457, 464 (6th Cir. 2001) (same); *Wells v. Liddy*, 186 F.3d 505, 528 (4th Cir. 1999) (same); *Williams v. United States*, 71 F.3d 502, 506 (5th Cir. 1995) (same); *L. Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc.*, 844 F.2d 955, 959 (2d Cir. 1988) (same); *Levine v. CMP Publ'ns, Inc.*, 738 F.2d 660, 667 (5th Cir. 1984) (same); *Reeves v. Am. Broad. Cos.*, 719 F.2d 602, 605 (2d Cir. 1983) (same); *Cianci v. New Times Publ'g Co.*, 639 F.2d 54, 70 (2d Cir. 1980) (same); *Hanley v. Trib. Publ'g Co.*, 527 F.2d 68, 70 (9th Cir. 1975) (same); *Selle v. Pierce*, 494 N.W.2d 634, 636-37 (S.D. 1993) (same).

On the fourth factor, "the relationship between the parties arises from Plaintiff's position as a California Congressman." (Defs.' App. 18; R.Doc. 90, at 18.) Based on these factors, "California has the most significant relationship." (Defs.' App. 19; R.Doc. 90, at 19.) The considerations of Section 6 also favored California. "[A]ny interest Iowa might have in compensating a California tort victim or in providing a forum for redress of an injury caused to a California citizen is difficult to see." (Defs.' App. 19-22; R.Doc. 90, at 19-22.)

This analysis, adopted by the district judge, was correct. California is where the Congressman resides. (App. 878; R.Doc. 138-1, at 12.) It is where he was elected to Congress for nearly two decades. (App. 1074; R.Doc. 138-1, at 208.) *See Condit v. Dunne*, 317 F. Supp. 2d 344, 354 (S.D.N.Y. 2004) (applying California law to California congressman's defamation claims). His Iowa contacts are minimal, "visit[ing] with his family" "on a few occasions." (App. 878; R.Doc. 138-1, at 12.) The only supposed harm the Congressman complains about is damage to his reputation in California, or to his professional reputation as a California congressman. Br. 50, 53. He alleges his "career" is "distinguished" by his "dedication and service to his constituents"—all in California. (App. 380; R.Doc. 103, at 3.)

In another defamation case filed by the Congressman, the court applied

36

the law of his domicile, California. *See Nunes v. Cable News Network, Inc.*, 31 F.4th 135, 148 (2d Cir. 2022). The same outcome should hold here.

The Congressman argues Iowa law governs because that is where Lizza did reporting, NuStar is located, and some of Lizza's sources reside. Br. 10-12, 46-47. But Iowa is "more of a backdrop for events that affected [the Congressman's] experience as a figure in California and national politics" (Defs.' App. 18; R.Doc. 90, at 18), not where his reputation was most harmed. *See Fuqua Homes*, 388 F.3d at 622.

That the Link was viewable by residents of Iowa (and all 50 states) is immaterial. Br. 10-11. An argument that the Congressman "is injured whenever someone reads or hears about the" Article could "lead to ridiculous forum-shopping." *Kamelgard*, 585 F.3d at 343. Also of minimal relevance is "the state of defendant's incorporation and principal place of business," *Hanley*, 527 F.2d at 70—which is not Iowa, anyway. *Cf.* Br. 11 (citing *Kinsey v. N.Y. Times Co.*, 991 F.3d 171 (2d Cir. 2021) (where neither side argued for law of plaintiff's domicile, "most significant relationship" where article published). The Congressman's other authorities are distinguishable.[12]

---

[12]   *See* Br. 10-11 (citing *Nix v. Major League Baseball*, 62 F.4th 920, 932 (5th Cir.) (applying New York law; plaintiff complained of inability to be hired due to statement by New York-based defendants to New York-based MLB office about lawsuit plaintiff filed in New York), *cert. denied*, 144 S. Ct. 165 (2023); *Sarver v. Chartier*, 813 F.3d 891, 898 (9th Cir. 2016) (declining to apply New

## 2. *The Link Was Not a Republication of the Article.*

Below, Congressman Nunes did not dispute that, under California's "single publication rule," sharing a hyperlink is not a republication. (*See* App. 602-36; R.Doc. 130.) "Rather than arguing and citing facts," the Congressman stated "republication of the Article occurred on November 20, 2019" with "no factual or legal support." (Add. 111; App. 249; R.Doc. 149, at 93.)

Now, he argues the Link *could* be a republication, because the Article reached a "new audience." Br. 12-13. It is too late. This argument is waived. *Satcher*, 558 F.3d at 735.

Regardless, the Congressman cites no evidence (there is none) of a "new audience," however that is defined. The "audience" for the Link is the same as the "audience" for the Article in September 2018: The same day the Article was published, Lizza tweeted a hyperlink to the Article to the same Twitter account where he posted the Link in November 2019. (App. 894-96; R.Doc. 138-1, at 28-30.) While this Court held, on a motion to dismiss (assuming Iowa law applied), it was "plausibly alleged" the Link republished the Article to a

---

Jersey law; "little basis to conclude that New Jersey was indeed [plaintiff's] legal domicile at the time"); *Davis v. Costa-Gavras*, 580 F. Supp. 1082, 1093 (S.D.N.Y. 1984) (choosing law of single state in suit brought by multiple "public servants from different jurisdictions," to not "chill[] defendants' conduct" of protected speech); Br. 46 (citing *Rudin v. Dow Jones & Co.*, 510 F. Supp. 210, 216 (S.D.N.Y. 1981) (deferring choice of law decision)).

38

new audience, discovery did not support that allegation.

Regardless, Appellants cannot square their argument with the multiple courts holding "California's single publication rule does not consider a tweet of an article to be a republication" of the linked article. (Defs.' App. 15, 22; R.Doc. 90, at 15, 22 (citing *Penrose Hill*, 479 F. Supp. 3d at 852).)

California's "single-publication rule limits tort claims premised on mass communications to a single cause of action that accrues upon the first publication." *Roberts v. McAfee, Inc.*, 660 F.3d 1156, 1166 (9th Cir. 2011). It applies to internet publications. *Traditional Cat Ass'n, Inc. v. Gilbreath*, 118 Cal. App. 4th 392, 404 (2004); *see also* Cal. Civ. Code § 3425.3 (Uniform Single Publication Act, adopted by California but not Iowa).

Courts applying California law uniformly hold that, under the single publication rule, hyperlinks are not "republications" of the linked content. *See Penrose Hill*, 479 F. Supp. 3d at 851-53; *Perlman v. Vox Media, Inc.*, No. CV-N19C-07-235, 2020 WL 3474143, at *8-9 (Del. Super. Ct. June 24, 2020), *aff'd*, 249 A.3d 375 (Del. 2021); *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, No. 02 CV 2258, 2007 WL 935703, at *7 (S.D. Cal. Mar. 7, 2007). This aligns with the great weight of authority across the country.[13]

---

[13]     *Lokhova v. Halper*, 995 F.3d 134, 143 (4th Cir. 2021) (Virginia law); *Clark v. Viacom Int'l Inc.*, 617 F. App'x 495, 504 (6th Cir. 2015) (Tennessee law); *In re Phila. Newspapers, LLC*, 690 F.3d 161, 175 (3d Cir. 2012), *as corrected* (Oct. 25,

39

The reasoning of this precedent is sound and, importantly, has been adopted not only by courts applying California law, but also in the past by this Court. *Shepard v. TheHuffingtonPost.com*, 509 F. App'x 556 (8th Cir. 2013) (unpublished), *aff'g pursuant to 8th Cir. R. 47B*, No. CIV. 12-1513, 2012 WL 5584615, at *2 (D. Minn. Nov. 15, 2012) (Minnesota law; "hyperlinks to the original article" not new publication).

Hyperlinks are reference tools. They "direct[]" readers to a "previous" publication. *Lokhova*, 995 F.3d at 143. There is "no principled reason for holding a hyperlink distinct from a traditional reference, such as a footnote, for purposes of republication." *Id.* (collecting cases); *see also Clark*, 617 F. App'x at 505; *In re Phila. Newspapers, LLC*, 690 F.3d at 175.[14] That the hyperlink may

---

2012) (Pennsylvania law); *Salyer v. S. Poverty L. Ctr., Inc.*, 701 F. Supp. 2d 912, 916 (W.D. Ky. 2009) (Kentucky law); *In re Min. Res. Int'l, Inc.*, 565 B.R. 684, 698 (Bankr. D. Utah 2017) (Utah law); *Allstate Ins. Co. v. Shah*, No. 15-CV-01786, 2017 WL 1228406, at *4 n.33 (D. Nev. Mar. 31, 2017) (Nevada law); *Doctor's Data, Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1137 (N.D. Ill. 2016) (Illinois law); *Klayman v. City Pages*, No. 13-CV-143, 2015 WL 1546173, at *12 (M.D. Fla. Apr. 3, 2015) (Florida law), *aff'd*, 650 F. App'x 744 (11th Cir. 2016); *U.S. ex rel. Klein v. Omeros Corp.*, 897 F. Supp. 2d 1058, 1074 (W.D. Wash. 2012) (Washington law); *Biro v. Conde Nast*, 171 A.D.3d 463 (N.Y. App. Div. 2019) (New York law).

[14] The Link is not a "republication" under Iowa law, either. It is not a "copy" of the original content. *Morse v. Times-Republican Printing Co.*, 100 N.W. 867, 871 (Iowa 1904). Even if a hyperlink might "republish" linked content if it reached a "new audience," there is no evidence of that here. *Supra* pp. 38-39.

40

"call the *existence* of the article to the attention of a new audience" is

inconsequential. *Salyer*, 701 F. Supp. 2d at 916 (emphasis in original).[15] The

Congressman's cases are inapposite.[16]

>    3.    *No Evidence of Special Damages.*

The Congressman does not dispute that "Nunes can recover only special

damages because he did not properly follow the California retraction statute."

(Add. 112; App. 250; R.Doc. 149, at 94 (citing *Anschutz Ent. Grp., Inc. v. Snepp*,

171 Cal. App. 4th 598, 640-41 (2009) (discussing Cal. Civ. Code § 48a(1))).)

"[S]pecial damages under Section 48a are limited to evidenced damages

suffered to a plaintiff's 'property, business, trade, profession, or occupation,

---

[15]    If text accompanying a hyperlink *is itself* defamatory, a court may reach a different conclusion. *E.g.*, *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 278 (S.D.N.Y. 2016). There is no allegation the text in Lizza's tweet was defamatory.

[16]    Br. 13-14 (citing *Yeager v. Bowlin*, 693 F.3d 1076, 1082, 1084 (9th Cir. 2012) (content not republished by "continuing to host the statement on a website"); *Unsworth v. Musk*, No. 18-CV-08048, 2019 WL 8220721, at *11 (C.D. Cal. Nov. 18, 2019) (Musk responsible for *damages* from republication *by BuzzFeed*); *Larue v. Brown*, 333 P.3d 767, 773 (Ariz. Ct. App. 2014) (commentary appended to page "re-alleged the substance of the original articles" and "added to and altered the substance of the original material")). The Congressman also cites to the concurring opinion of Judge Werdeger in *Christoff v. Nestle USA, Inc.*, 47 Cal. 4th 468, 482 (2009) (declining to decide, without factual record, how single publication rule applies to a clothing label)—and "Justice Werdegar's concurrence was not adopted by the majority and therefore is not the law of California," *Roberts*, 660 F.3d at 1168.

41

including the amounts of money the plaintiff alleges and proves he or she has expended as a result of the alleged libel, and no other.'" (Add. 113; App. 251; R.Doc. 149, at 95 (quoting Cal. Civ. Code § 48a(d)(2)).) They include only "items of loss that are more or less peculiar to the particular plaintiff," and for which the plaintiff can show it "actually suffered the loss in the specific amount." *O'Hara v. Storer Commc'ns, Inc.*, 231 Cal. App. 3d 1101, 1113 (1991), *reh'g denied & opinion modified* (July 24, 1991).

Special damages "must be proved to a reasonable certainty." *Id.* A "general allegation of loss of prospective employment [is] not sufficient." *Gomes*, 136 Cal. App. 3d at 940. Where there is no quantification of "out-of-pocket losses" and no "economic loss in [the plaintiff's] employment," there is no showing of special damages. *Id.* "[V]aguely aver[ring]" lost "revenue" without any methodology is insufficient. *Trendmood, Inc. v. Rabinowitz*, No. 20-CV-10877, 2021 WL 5277441, at *4 (C.D. Cal. Aug. 31, 2021).

Below, the Congressman claimed he suffered "scrutiny," "[h]is ethics and leadership [being] questioned," "shame," "embarrassment," and an inability to give tours of his uncle's Tulare farm. (App. 622-23; R.Doc. 130, at 21-22.) None of these are special damages. Below, he did not argue otherwise. He has waived this argument. *Satcher*, 558 F.3d at 735.

Regardless, the Congressman made "no accounting and provide[d] no

formula on which to base his damages." (Add. 113; App. 251; R.Doc. 149, at 95.) He had no expert or methodology. He did "not show being confronted by various persons at work negatively impacted his occupation or ability to work." (*Id.*) He won every election and was awarded the Presidential Medal of Freedom. (App. 1074, 1076; R.Doc. 138-1, at 208, 210.) He did not show "changes in campaign fundraising damaged his campaign and thus his occupation." (Add. 113; App. 251; R.Doc. 149, at 95.) Rather, his campaign contributions *increased* following the Link. (App. 1077-80; R.Doc. 138-1, at 211-14.)

The Congressman now complains the Link had an "impact on the 2018 Congressional election"—impossible, as it was posted in November 2019—and about an "impairment of future career opportunities, and a financial impact on his ability to fundraise," Br. 52. But he does not and cannot cite evidence of specific lost career opportunities or drops in fundraising. Rather, he left Congress to become CEO of Trump Media and Technology Group, drawing a $1 million annual salary with bonus eligibility and 145,000 restricted share units. (App. 1080-82; R.Doc. 138-1, at 214-16.)

### 4. *Hearst Did Not Publish the Link.*

By November 2019, Lizza was no longer writing for Hearst. His contract had ended in June 2019. (Defs.' App. 219, 225, 263-66; R.Doc. 118-193, at 4,

43

10, 48-51.) Nobody at Hearst told Lizza to post the Link. (Defs.' App. 34, 60; R.Doc. 118-23, at 51; R.Doc. 118-192, at 10.) The district court correctly concluded Hearst was not a publisher of the Link. The Congressman's cases are inapposite. Br. 47-48 (citing *Brown v. First Nat'l Bank of Mason City*, 193 N.W.2d 547, 555 (Iowa 1972) (defendant liable for "reasonably foreseeable" damages), and *Belcher v. Little*, 315 N.W.2d 734, 738 (Iowa 1982) (considering whether statement made only to plaintiff is a "publication")).

> **B.    The Congressman Failed to Put Forth Clear and Convincing Evidence Appellees Intended to Convey the Implication.**

> *1.    Actual Malice.*

The First Amendment requires public official defamation plaintiffs to prove, by clear and convincing evidence, that challenged statements were made with "actual malice." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 (1984); *N.Y. Times v. Sullivan*, 376 U.S. 254 (1964).

Actual malice is "knowledge that [the statement] was false" or "reckless disregard of whether it was false or not." *Sullivan*, 376 U.S. at 280. "[R]eckless disregard" means the author "in fact entertained serious doubts as to the truth of their publication," with a "high degree of awareness of probable falsity." *Secrist v. Harkin*, 874 F.2d 1244, 1251-52 (8th Cir. 1989) (citations and alterations omitted). This contemplates extraordinary circumstances, like when "the story was fabricated" or "there were particular reasons to doubt sources."

44

*Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1445 (8th Cir. 1989). This inquiry

turns on the defendant's subjective state of mind. *See Mercer v. City of Cedar

Rapids*, 308 F.3d 840, 850 (8th Cir. 2002).

### 2. Actual Malice as to the Meaning of the Implication.

For defamation *by implication*, the inquiry has another layer. To have

actual malice, the defendant must "*realize[]* that his statement was false or that

he subjectively entertained serious doubt" as to its truth. *Bose*, 466 U.S. at 511

n.30 (emphasis added). Thus, a plaintiff must first "show with clear and

convincing evidence that the defendants intended or knew of the implications

that the plaintiff is attempting to draw from the allegedly defamatory

material." *Saenz v. Playboy Enters., Inc.*, 841 F.2d 1309, 1318 (7th Cir. 1988); *see

also Howard v. Antilla*, 294 F.3d 244, 252 (1st Cir. 2002) (same, quoting *Saenz*);

*Compuware Corp. v. Moody's Invs. Servs., Inc.*, 499 F.3d 520, 528 (6th Cir. 2007)

(same); *Janklow*, 759 F.2d at 649 (granting summary judgment; article could

not "be read to imply that [publisher] espoused the validity of the"

implication).

It is not enough that the defamatory meaning was "possible"; the

speaker must have "known" it was "likely," and "still made the statement

despite their knowledge of that likelihood." *Kendall v. Daily News Publ'g Co.*,

45

716 F.3d 82, 90-92 (3d Cir. 2013); *Saenz*, 841 F.2d at 1318.[17] Even if the implication were "clear and inescapable," that would not show, with "convincing clarity," the defendant harbored actual malice toward that meaning. *Newton*, 930 F.2d at 681-82. As the district court observed, this constitutional requirement has been applied by California's state courts. (Add. 103; App. 241; R.Doc. 149, at 85 (citing *De Havilland*, 21 Cal. App. 5th at 869-70 (plaintiff "must demonstrate that [the defendant] either deliberately cast [their] statements in an equivocal fashion in the hope of insinuating a defamatory import to the reader, or that [they] knew or acted in reckless disregard of whether [their] words would be interpreted by the average reader as defamatory statements of fact" (quoting *Good Gov't Grp. of Seal Beach, Inc. v. Super. Ct.*, 22 Cal. 3d 672, 684 (1978))).)[18]

---

[17]    This is different than the inquiry on a motion to dismiss, when the Congressman needed only to "plausibly allege[] that Lizza and Hearst intended or endorsed the implication," pointing to elements of the Article. *Nunes*, 12 F.4th at 899.

[18]    And because the California "state Constitution's free speech provision is at least as broad as and in some ways is broader than the comparable provision of the federal Constitution's First Amendment," *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 958-59 (2002), *as modified* (May 22, 2002) (citations omitted), this element is necessarily required by California *state* law, too, as the district court held. (Add. 103; App. 241; R.Doc. 149, at 85.)

46

### 3. The Congressman Waived the Argument.

Below, the Congressman did "not argue on this element." (Add. 116; App. 254; R.Doc. 149, at 98.) He "simply state[d] in his brief 'the intended and endorsed defamatory implication' once when outlining the implication, and discusse[d]" this Court's prior holding "that plaintiff *plausibly pled* that defendants intended the implication." (*Id.* (emphasis added).) This argument is waived on appeal. *Satcher*, 558 F.3d at 735.

### 4. The Congressman Failed to Show that Appellees Intended to Convey the Implication.

Regardless, there is "no genuine issue of material fact as to [Appellees' lack of] intent to convey the defamatory impression" that Nunes "conspired," in a literal sense, to hide that NuStar hires undocumented workers. (Add. 116; App. 254; R.Doc. 149, at 98.) Such a reading of the Article did not occur to Lizza. (Defs.' App. 227-28; R.Doc. 118-193, at 12-13.) Rather, the unrebutted testimony shows that, when Lizza asked the question, "Why would the Nuneses, Steve King, and an obscure dairy publication all conspire to hide the fact that the congressman's family sold its farm and moved to Iowa?," he did not mean a legal conspiracy or formal agreement. He meant it in a vernacular sense, consistent with its dictionary meaning to "act in harmony." (*Id.*)

The Congressman's three-sentence argument simply references the Court's decision at the motion to dismiss stage. Br. 49. That has no bearing on

the present inquiry. And he does not identify the "substantial evidence" that "prove[s]" his point, *id.*, or explain how he met his burden to present "clear and convincing" evidence, *Anderson*, 477 U.S. at 247.

### C. There Is No Clear and Convincing Evidence of Actual Malice as to the Truth of the Implication.

There is also no "clear and convincing" evidence that Lizza knew the purported implication was false. *Id.* Rather, discovery showed Lizza—with good reason—believed the Congressman knew NuStar hired undocumented workers, discouraging him from publicly discussing the farm.

Lizza's extensive reporting informed his belief that Midwestern dairy farms run on undocumented labor. (Defs.' App. 229-34, 255-56; R.Doc. 118-193, at 14-19, 40-41.) This led him to believe, as his credible sources told him, NuStar necessarily understood the nature of its workforce. (Defs.' App. 249-56; R.Doc. 118-193, at 34-41.) Lizza reasonably believed the NuStar Appellants were in on the "open secret that the system is built on easily obtained fraudulent documents." (Defs.' App. 273; R.Doc. 118-193, at 58.)

The Congressman would know this, too. A champion of San Joaquin Valley farmers, he sponsored numerous bills that sought amnesty for unauthorized dairy workers, as Lizza knows. (App. 1034-38; Defs.' App. 256-57; R.Doc. 118-193, at 41-42; R.Doc. 138-1, at 168-82.) From this, Lizza inferred the Congressman knows that many dairy workers, like NuStar's, are

Appellate Case: 23-2322     Page: 63     Date Filed: 01/19/2024 Entry ID: 5355052

undocumented. This, Lizza reasoned, makes the Congressman reluctant to speak publicly about NuStar. (Defs.' App. 256-58; R.Doc. 118-193, at 41-43.)

Previously, accepting the allegations as true, this Court found it "plausibly alleged" that Lizza harbored doubts about the accuracy of the implication when he shared the Link in November 2019 because, by that time, he had received the Congressman's original complaint in this case. *Nunes*, 12 F.4th at 901. The district court ported that conclusion into its analysis at the summary judgment stage: Because "Lizza was informed of its alleged falsity and then spoke the allegedly defamatory implication again," the Congressman had put forth "clear and convincing" evidence Lizza had "actual malice" toward its truth, the lower court held. (Add. 117-18; App. 255-56; R.Doc. 149, at 99-100.)

By conflating the two standards, the district court erred.[19] A denial by a plaintiff prior to publication is not, itself, "clear and convincing" evidence of actual malice. *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 691 n.37 (1989). A denial "only 'serves to buttress a case for actual malice when there is something in the content of the denial or supporting evidence produced

---

[19]     This Court recognized this important procedural distinction in its prior opinion. *Nunes*, 12 F.4th at 901 (distinguishing *Edwards*, 556 F.2d 113; that opinion was issued after a consideration of the evidence).

in conjunction with the denial that carries a doubt-inducing quality.'" *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 281-82 (S.D.N.Y. 2013) (citation omitted), *aff'd*, 807 F.3d 541 (2d Cir. 2015), and *aff'd*, 622 F. App'x 67 (2d Cir. 2015); *see also Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 242 (D.C. Cir. 2021).

Courts routinely affirm summary judgment where, as here, the plaintiff's only evidence to support a charge of actual malice is a denial prior to publication. *See, e.g.*, *Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1043 (10th Cir. 2013); *Harris v. City of Seattle*, 152 F. App'x 565, 569 (9th Cir. 2005); *Lohrenz v. Donnelly*, 350 F.3d 1272, 1285 (D.C. Cir. 2003); *Bertrand v. Mullin*, 846 N.W.2d 884, 900 (Iowa 2014).

Neither the Congressman's September 2019 demand letter, nor his original complaint later that month, caused Lizza to doubt the accuracy of the implication. (Defs.' App. 259-61; R.Doc. 118-193, at 44-46.) Both documents alleged several specific statements were defamatory. The implication was not listed. (App. 36-39; Defs.' App. 36-44; R.Doc. 1, at 12-15; R.Doc. 118-156.) They both alleged that the "defamatory gist and false implication" was a conspiracy to conceal "criminal wrongdoing"—but neither identifies the "criminal wrongdoing." (App. 40; Defs.' App. 43; R.Doc. 1, at 16; R.Doc. 118-156, at 8.)

Instead, the complaint describes the "conspiracy" as such: "Plaintiff

50

'conspired' with his own family, Congressman King, and an Iowa dairy publication to 'hide' his family's 'secret' move to Iowa." (App. 37; R.Doc. 1, at 13.) This is how the Congressman described the "conspiracy" himself, on his website. (Defs.' App. 49; R.Doc. 118-171, at 25 (devinnunes.com: Article "falsely claim[ed] that Nunes conspired to hide a business venture operated by his family members in Iowa").) Struck by the Congressman's failure to challenge his reporting that NuStar hires undocumented workers, Lizza tweeted on November 21, 2019 (one day after the Link) that the Congressman "didn't dispute the core finding that his family's dairy used undocumented immigrants." (App. 938-39; Defs.' App. 260; R.Doc. 138-1, at 72-73; R.Doc. 118-193, at 45.)

In sum, the evidence shows that, based on his review of the retraction demand and original complaint, Lizza determined the Congressman had not disputed that he was aware that NuStar hires undocumented workers. Even if the Congressman had expressly denied that fact, Lizza would not have believed that denial, in light of his reporting. (Defs.' App. 261; R.Doc. 118-193, at 46.)[20]

---

[20] The original complaint was also rife with bombast and bizarre allegations concerning Lizza, which he knew to be false. To Lizza, this further undermined the credibility of the document. (*Id.*)

51

**D.    The Congressman's Claim for Defamation by Implication, Based on the Reporting of True Facts, Is Unconstitutional.**

The First Amendment does not permit liability for defamation by implication when the published facts are true, and there is no material omission. *See Janklow*, 759 F.2d at 648. Such a claim impermissibly punishes publishers' exercise of editorial discretion. *See Miami Herald*, 418 U.S. 241. This argument, presented below (Defs.' App. 66-68; R.Doc. 145, at 32-34), is an alternative basis to affirm.

The First Amendment "absolutely prohibits punishment of truthful" statements. *Garrison v. State of La.*, 379 U.S. 64, 78 (1964); *see also Hepps*, 475 U.S. at 776; *Milkovich*, 497 U.S. at 19-20; *Janklow*, 759 F.2d at 649. It also protects editorial decisions *not* to print what the publisher would prefer not to print. *Miami Herald*, 418 U.S. at 256. "The choice of material to go into a newspaper" and "treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment," and it has "yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press." *Id.* at 258.

This Court has applied these principles to a defamation by implication claim. In *Janklow*, *Newsweek* accurately reported that the former South Dakota attorney general had been accused of rape in a tribal court. Janklow sued for

52

defamation anyway, arguing the article implied he was "guilty of the rape," and to negate that implication, Newsweek should have published "additional facts that [Janklow] believe[d]" would demonstrate his innocence. *Janklow*, 759 F.2d at 648.

This Court rejected that argument. "We see no constitutionally significant distinction between the law struck down in *Miami Herald*, which made it a misdemeanor not to publish a specific item, and a cause of action that would permit a plaintiff to recover damages based on mere failure to publish a specific item." *Id.* "[F]or a recovery to lie, there must be a showing that what has been omitted has made a material assertion of fact untrue." *Id.*

The Congressman's claim tracks *Janklow*. He argues he has been defamed by implication through the juxtaposition of facts. But the reported facts that supposedly give rise to that implication have all been shown, through discovery, to be materially true.

Specifically, the Congressman argues the Article defamed him by implying he "conspired or colluded with his family, Rep. King and with others to hide or cover-up that NuStar employs undocumented labor." (App. 389; R.Doc. 103, at 12.) This implication arises from the "juxtapos[ition of] a series of [reported] facts": **(a)** "the supposed conspiracy to hide the farm's move" by not talking about it publicly; **(b)** "the use of undocumented labor at

Midwestern dairy farms"; **(c)** "the Nunes family farm's alleged use of undocumented labor"; and **(d)** the Congressman's "position on immigration enforcement." *Nunes*, 12 F.4th at 897-98.

Each of these "juxtapose[d] . . . facts," as reported, is materially true.

For **(a)**, Lizza could not find any "public[] mention[]" by the Congressman that "his family dairy is no longer in Tulare," referring to his father and brother. (Defs.' App. 271; R.Doc. 118-193, at 56.) Appellants admitted there was no public mention of the farm's move. (App. 950-51; R.Doc. 138-1, at 84-85.) And the NuStar Appellants confirmed that, as Lizza reported, NuStar (i) insisted to the *Dairy Star* that it omit the Congressman in its story about NuStar, then, (ii) in 2018, demanded the *Dairy Star* take down the article to avoid "publicity." (App. 951; R.Doc. 138-1, at 85.)

With respect to the other "juxtaposed" facts, after discovery, it is not genuinely disputed that **(b)** Midwestern dairies, and **(c)** NuStar, specifically, rely on undocumented labor, *see supra* pp. 9-12, and **(d)** the Congressman "has long supported moderate immigration reform," "including amnesty for many undocumented people," as the Article reports. (App. 910, 1038-48; R.Doc. 138-1, at 44, 172-82.)

Though the reported facts are true, the Congressman seeks to hold Appellees liable for an unwritten implication—and on his theory, there are

54

only two ways Appellees could absolve themselves of liability. One would be to refrain from publishing true facts. But that is constitutionally protected; a state's libel laws cannot restrict that. *Garrison*, 379 U.S. at 78. Or, Appellees could appease the Congressman through editorial decisions, such as printing additional facts about the Congressman's claimed lack of connections to his family's farm.[21] That is also unconstitutional: The state cannot compel the publisher to print additional facts that, in its editorial discretion, it would refrain from publishing. *Miami Herald*, 418 U.S. at 256; *Janklow*, 759 F.2d at 648.[22]

Even if the Congressman's claim could pass constitutional muster, the burden was on him to prove the implication was false—not on Appellees to prove truth. *Hepps*, 475 U.S. at 775-77. He could not meet that burden on this record. His public statements and legislative record show he is well aware

---

[21] This second option was not available here: Appellants refused to return Appellees' numerous requests for comment, preventing Appellees from learning additional facts Appellants might have wanted included in the Article. (App. 923-24; R.Doc. 138-1, at 57-58.)

[22] *Toney v. WCCO Television, Midwest Cable & Satellite, Inc.*, 85 F.3d 383 (8th Cir. 1996), is not to the contrary. Applying Minnesota law, *Toney* recognized the Supreme Court did not foreclose defamation by implication in *Milkovich v. Lorain Journal*—but the implication in *Milkovich* arose from a false express statement that could be understood as a statement of fact (that Milkovich had "lied" under "oath"). *Milkovich*, 497 U.S. at 5. Here, in contrast, the implication arises from reported facts that, discovery has shown, are true.

Appellate Case: 23-2322     Page: 70     Date Filed: 01/19/2024 Entry ID: 5355052

farms like NuStar depend on undocumented labor (App. 1034-48; R.Doc. 138-1, at 168-82), he admitted he knew NuStar would not scrutinize or question any proffered work authorization documents (App. 1025-28; Defs.' App. 25-27, 30-31; R.Doc. 118-12, at 9, 40-41; R.Doc. 118-22, at 24-25; R.Doc. 138-1, at 159-62), he speaks to his father constantly, and they agreed not to speak to Lizza (App. 1029-34; R.Doc. 138-1, at 163-68). Against this evidence is his conclusory denial, which cannot meet his burden. *See supra* p. 22.

## III. THIS COURT LACKS JURISDICTION TO REVIEW THE MAGISTRATE JUDGE'S DISCOVERY RULING

The Congressman argues the magistrate judge erred by granting a discovery motion to preclude him from relying on certain witnesses he did not timely include in his initial disclosures. Br. 54-56. The Congressman never objected to that ruling with the district judge. This Court lacks jurisdiction to consider this issue. Fed. R. Civ. P. 72(a); *St. Jude Med.*, 779 F.3d at 902; *Daley v. Marriott Int'l, Inc.*, 415 F.3d 889 (8th Cir. 2005).

Regardless, there was no "gross abuse of discretion resulting in fundamental unfairness at trial." *Lee v. Armontrout*, 991 F.2d 487, 489 (8th Cir. 1993) (citation and quotation marks omitted). It was unacceptable for the Congressman to, weeks before the close of discovery, disclose 27 high-profile Republican politicians (plus two staffers) as damages witnesses, where the Congressman admitted that he had known, for years, they possessed

Appellate Case: 23-2322    Page: 71    Date Filed: 01/19/2024 Entry ID: 5355052

supposedly relevant knowledge. *See Sellers v. Mineta*, 350 F.3d 706, 711 (8th Cir. 2003).

## **CONCLUSION**

The district court's judgment should be affirmed, with costs.

Dated: January 18, 2024

Respectfully submitted,

*/s/ Jonathan R. Donnellan*
Jonathan R. Donnellan, *Lead Counsel*
 *jdonnellan@hearst.com*
Ravi V. Sitwala
 *rsitwala@hearst.com*
Nathaniel S. Boyer
 *nathaniel.boyer@hearst.com*
Sarah S. Park
 *sarah.park@hearst.com*
Kristen L. Hauser
 *khauser@hearst.com*
Nina N. Shah
 *nina.shah@hearst.com*
THE HEARST CORPORATION
Office of General Counsel
300 West 57th Street
New York, New York 10019
Telephone: (212) 841-7000
Facsimile: (212) 554-7000

*Attorneys for Defendants-Appellees*

57

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,931 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This count is from the word-count function of Microsoft Word.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word Version 16.0.16731.20496 (part of Microsoft Word for Office 365 MSO) in 14-point Calisto MT font.

Dated: January 18, 2024

*s/ Jonathan R. Donnellan*

Jonathan R. Donnellan
HEARST CORPORATION
300 West 57th Street
New York, New York 10019
Phone: (212) 841-7000
jdonnellan@hearst.com

*One of Attorneys for Defendants-Appellees*

## CIRCUIT RULE 28A(h) CERTIFICATION

The undersigned hereby certifies that I have filed electronically, pursuant to Circuit Rule 28A(h), a version of the brief in non-scanned PDF format. I hereby certify that the file has been scanned for viruses and that it is virus-free.

*s/ Jonathan R Donnellan*
Jonathan R. Donnellan

Appellate Case: 23-2322    Page: 74    Date Filed: 01/19/2024 Entry ID: 5355052

## CERTIFICATE OF SERVICE

I hereby certify that, on January 18, 2024, I filed a copy of the foregoing

document using the Court's electronic filing system, which will send

notification of such filing to all counsel of record.

*s/ Jonathan R Donnellan*
Jonathan R. Donnellan

Appellate Case: 23-2322     Page: 75     Date Filed: 01/19/2024 Entry ID: 5355052